Consolidated Case Nos. 23-55431 & 23-3793

In the United States Court of Appeals
for the Ninth Circuit

B & L PRODUCTIONS, INC., et al.,
*Plaintiffs-Appellants.*

v.

GAVIN NEWSOM,
in his official capacity as Governor of the State of California and in his personal
capacity, et al.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of California
Case No. 3:21-cv-01718-AJB-DDL
Honorable Anthony J. Battaglia

GAVIN NEWSOM,
in his official capacity as Governor of the State of California and in his personal
capacity, et al.,
*Defendants-Appellants,*

v.

B & L PRODUCTIONS, INC., et al.,
*Plaintiffs-Appellees.*

On Appeal from the United States District Court
for the Central District of California
Case No. 8:22-cv-01518 JWH (JDEx)
Honorable John W. Holcomb

**PETITION FOR REHEARING EN BANC**

C.D. Michel
Anna M. Barvir
Tiffany D. Cheuvront
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com

Donald Kilmer
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Rd.
Caldwell, Idaho 83607
(408) 264-8489
don@dklawoffice.com

*Attorneys for Plaintiffs-Appellants and Plaintiffs-Appellees*

June 25, 2024

# CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for Plaintiffs-Appellees make these disclosures:

### ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION

Asian Pacific American Gun Owners Association is a California nonprofit organization, is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### B&L PRODUCTIONS, INC., DBA CROSSROADS OF THE WEST

B&L Productions, Inc., is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC.

California Rifle & Pistol Association, Inc. ("CRPA"), is a California nonprofit organization. CRPA is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### CAPTAIN JON'S LOCKERS, LLC

Captain Jon's Green Can Lockers, LLC, is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### L.A.X. FIRING RANGE, INC.

L.A.X. Firing Range, Inc., is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### SECOND AMENDMENT LAW CENTER

Second Amendment Law Center is a nonprofit organization, is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### SECOND AMENDMENT FOUNDATION

The Second Amendment Foundation ("SAF") is a nonprofit organization. SAF is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### SOUTH BAY ROD AND GUN CLUB, INC.

South Bay Rod and Gun Club, Inc. ("South Bay"), is a California nonprofit organization. South Bay is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Date: June 25, 2024

**MICHEL & ASSOCIATES, P.C.**

s/ Anna M. Barvir
Anna M. Barvir
*Attorneys for Plaintiffs-Appellants B&L Productions, Inc., Barry Bardack, Ronald J. Diaz, Sr., John Dupree, Christopher Irick, Robert Solis, Lawrence Michael Walsh, Captain Jon's Lockers, LLC, L.A.X. Firing Range, Inc., California Rifle & Pistol Association, Incorporated, and South Bay Rod and Gun Club, Inc.*

*Attorneys for Plaintiffs-Appellees B&L Productions, Inc., Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, California Rifle & Pistol Association, Incorporated, Asian Pacific American Gun Owners Association, Second Amendment Law Center, Inc.*

ii

Date: June 25, 2024                        **LAW OFFICES OF DONALD KILMER, APC.**

s/ Donald Kilmer
_____

Donald Kilmer
*Attorney for Plaintiff-Appellant Second Amendment Foundation*

*Attorney for Plaintiff-Appellee Second Amendment Foundation*

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement.................................................................. i

Table of Contents.................................................................................... iv

Table of Authorities ................................................................................ v

Rule 35 Statement................................................................................... 1

Statement of the Case .............................................................................. 2

Reasons for Rehearing ............................................................................. 5

I.    The Panel Decision Conflicts with the Supreme Court's Second Amendment Precedents.............................................................................. 5

II.   The Panel Decision Conflicts with this Circuit's Commercial Speech Doctrine as Applied to Gun Shows ......................................................... 12

III.  The Panel Decision Ignores Petitioners' Equal Protection Claims in Conflict with Supreme Court Precedent ................................................ 15

Conclusion........................................................................................... 15

Statement of Related Cases ..................................................................... 17

Certificate of Compliance........................................................................ 18

Certificate of Service ............................................................................. 19

*Attachment........................................................................................ 20

---

\* Petitioners attach both the panel opinion, as required by Rule Circuit Rule 40-1, and the district court opinions on appeal to assist this Court in its review of these consolidated appeals.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ........................................... 9

*Andrews v. State,*
  50 Tenn. 165 (1871) ........................................................ 5

*B&L Prods., Inc., v. 22nd Dist. Agric. Ass'n,*
  394 F. Supp. 3d 1226 (S.D. Cal. 2019) ......................... 13

*Cent. Hudson Gas & Elec. Comm'n v. Pub. Serv. Comm'n,*
  447 U.S. 557 (1980) .................................................... 2, 12

*Cf. Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ...................................................... 11

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................. 5, 6, 7

*Doe v. United States,*
  419 F.3d 1058 (9th Cir. 2005) ....................................... 9

*Duncan v. Bonta,*
  19 F. 4th 1087 (9th Cir. 2021) ..................................... 10

*Grosjean v. Am. Press Co.,*
  297 U.S. 233 (1936) ...................................................... 15

*Jackson v. City & Cnty. of San Francisco,*
  746 F.3d 953 (9th Cir. 2014) ....................................... 6, 7

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n,*
  584 U.S. 617 (2018) ...................................................... 15

*Minn. Star & Trib. Co. v. Minn. Comm'r of Revenue,*
  460 U.S. 575 (1983) ...................................................... 15

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
  597 U.S. 1 (2022) ................................................................. 1, 6, 7

*Nordyke v. King,*
  681 F.3d 1041 (9th Cir. 2012) ........................................... 13

*Nordyke v. Santa Clara Cnty.* ("*Nordyke 1997*"),
  110 F.3d 707 (9th Cir. 1997) ........................................... passim

*Police Dep't of Chicago v. Mosley,*
  408 U.S. 92 (1972) ............................................................ 2, 15

*Romer v. Evans,*
  517 U.S. 620 (1996) ......................................................... 15

*Silvester v. Harris,*
  843 F.3d 816 (9th Cir. 2016) ........................................... 7, 10

*Teixeira v. Cnty. of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ........................................... 6

*Teter v. Lopez,*
  76 F.4th 938 (9th Cir. 2023) ............................................ 8

*United States v. Chovan,*
  735 F.3d 1127 (9th Cir. 2013) ......................................... 7

*United States v. Rahimi,*
  __ U.S. __, 2024 WL 3074728 (June 21, 2024) .............. 6

*Whole Women's Health v. Hellerstedt,*
  579 U.S. 582 (2016) ......................................................... 11

**Statutes**

Cal. Penal Code §26805 ...................................................... 14

Cal. Penal Code §26815 ...................................................... 14

Cal. Penal Code §27200 ...................................................... 3

Cal. Penal Code §27245 ................................................................. 3

Cal. Penal Code §27310 ............................................................. 3, 14

Cal. Penal Code §27540 ............................................................... 14

Cal. Penal Code §27545 ............................................................... 14

Cal. Penal Code §27573 ................................................................. 3

Fed. R. Civ. P. 52 ......................................................................... 9

U.S. Const., amend. I .......................................................... 1, 4, 13

U.S. Const., amend. II ........................................................... 1, 5, 7

**Rules**

Fed. R. App. P. 35 ......................................................................... 1

# RULE 35 STATEMENT

Gun shows are public gatherings where people assemble, engage in lawful expressive activity, and conduct commerce in lawful products. Licensed gun dealers must still comply with all state and federal gun laws regulating commerce in arms. But California objects to gun shows taking place on public property. California thus adopted three statutes banning contract formation for the sale of guns and related products at any event held on state properties (while apparently allowing the display, marketing, and offers-for-sale). These laws violate the First and Second Amendments. They also violate equal protection by treating people seeking to exercise fundamental rights differently from other cultural and commercial enterprises held at the fairgrounds.

En banc rehearing is necessary because the panel decision conflicts with Supreme Court and circuit precedents, and because these proceedings involve questions of exceptional importance concerning fundamental rights affecting the lives of hundreds of thousands of law-abiding Californians. Fed. R. App. P. 35.

First, the opinion defies *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). It imposes a threshold burden on Petitioners[1] to prove a "meaningful constraint" on Second Amendment rights before holding the government to its burden to prove that the challenged law comports with our Nation's historical understanding of the Second Amendment. Op.18-19. The panel's reliance on a new "meaningful

---

[1] The plaintiffs were appellants in the Southern District case and appellees in the Central District case. For clarity, the plaintiffs are referred to collectively as Petitioners throughout.

constraint" (judicial balancing) test is not part of the Supreme Court's modern Second Amendment jurisprudence, and it is the most compelling reason for en banc review.

The decision also conflicts with well-established commercial speech precedents, including this circuit's cases regulating commercial speech at gun shows. *See Nordyke v. Santa Clara Cnty.* ("*Nordyke 1997*"), 110 F.3d 707 (9th Cir. 1997); *Cent. Hudson Gas & Elec. Comm'n v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980). It surprisingly holds that speech constituting an "acceptance" in contract formation, negotiation, and sale consummation is speech that is categorically *unprotected* by the commercial speech doctrine. Op.13-14. And it somehow finds that a ban on firearm "sales" at gun shows on state property, but not gun shows themselves, survives constitutional scrutiny, Op.11-20—even though *Nordyke 1997* held that such a restriction does not directly advance the government's purported interest.

Finally, the decision conflicts with Supreme Court precedent in cases where animus results in the unequal treatment of groups in similar circumstances. Here it is the use of public spaces for commerce and expressive activities disfavored by the government. *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95-96 (1972).

This case should be reheard en banc.

## STATEMENT OF THE CASE

B&L Productions, Inc., has operated gun shows throughout California, including the Del Mar Fairgrounds and the Orange County Fair & Event Center, for more than 30 years. 1-ER-006.[2] Its gun shows bring together like-minded individuals "to engage

---

[2] Unless otherwise noted, record citations are to the Excerpts of Record in the Central District appeal.

in commerce related to, and necessary for, the lawful and regulated exercise of Second Amendment rights." 2-ER-244; 2-SER-335-79.

California strictly regulates commerce in firearms and ammunition. This is also true for sales at gun shows, where laws regulating commerce in arms are at their strictest. 1-ER-006-07. *See also* Cal. Penal Code §§27200-27245. Firearm transactions at gun shows must still comply with all laws governing the sale of firearms and ammunition at permanent retail locations. Cal. Penal Code §27310. In short, there is no "gun show loophole" in California.

Even so, California objects to these events taking place on public property. The State thus adopted AB 893, amending the California Food & Agricultural Code to add section 4158, forbidding anyone to "contract for, authorize, or allow the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds." S.D.Cal.App. 2-ER-95, 252. SB 264 codified Penal Code section 27575, which bars any "officer, employee, operator, lessee, or licensee of the" 32nd DAA from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm, firearm precursor part, or ammunition on the property or in the building that comprise the OC Fair & Event Center." 1-ER-008. SB 915 expanded the law to cover *all* state-owned properties. 1-SER-152-53l; Cal. Penal Code §27573.

Although the Challenged Statutes do not *expressly* "ban" gun shows, that is their stated goal. Before Judge Holcomb enjoined SB 264 and SB 915, B&L had been unable to schedule a single event at any state-owned property since before the laws took effect. 2-SER-339-41. The bills' legislative histories are clear; they were meant to end gun shows at all state-owned venues by removing the financial underpinning of such events.

3

2-ER-230-34, 38-41; 1-SER-117, 122-25, 130-31, 136-140, 145-48, 157-60, 165-66, 171-72, 175-77, 183-85. Senator Min, the sponsor of SB 264 and SB 915, stated that the ban "ensure[s] that the state is not profiting from the sale of firearms and ammunition on state property or facilitating gun shows that would undermine California's strong firearm regulations." 1-ER-008.

Petitioners sued in the Southern and Central Districts of California, alleging that the Challenged Statutes violate the First Amendment, Second Amendment, and Equal Protection Clause. 2-ER-242-305.

In the Southern District case, the trial court granted the State's motion to dismiss and entered judgment for the State. S.D.Cal.App.2-ER-33-37. In that court's view, AB 893 restricts only the exchange of money for firearms and related products at the fairgrounds. S.D.Cal.App.1-ER-8. That court also summarily dismissed plaintiffs' allegations that banning the commercial sale of arms at the fairgrounds effectively bans gun shows at that venue. 1-ER-8. The court thus held there was no First Amendment violation. S.D.Cal.App. 1-ER-8. On Petitioners' Second Amendment claim, that court ruled that because plaintiffs' ability to acquire or purchase firearms elsewhere was not eliminated, they had no claim. S.D.Cal.App.1-ER-10-11. As to the equal protection claim, the district court ruled (despite well-plead allegations) that plaintiffs "failed to allege any facts showing that impermissible animus and viewpoint discrimination prompted the enactment of AB 893." S.D.Cal.App.1-ER-12.

In the Central District case, the court granted B&L's motion for preliminary injunction, finding that plaintiffs were likely to succeed on all three claims. The Central District rejected the State's claim that, because "the act of exchanging money for a gun

is not 'speech,'" the Challenged Statutes do not restrict speech. 1-ER-016. Instead, the court held that the Challenged Statutes "exceed the mere prohibition of 'exchanging money for a gun." 1-ER-016. The court then held that the laws unlawfully infringed on commercial speech and censored expressive conduct, 1-ER-014-19, and that the State was likely engaging in unlawful viewpoint discrimination, 1-ER-022-23. The Central District then held that the Challenged Statutes likely violate the Second Amendment, finding that the State had failed to meet its burden to prove that history supports an arbitrary ban on the sale of arms on public property. 1-ER-030. Finally, because the trial court found that Petitioners were likely to succeed on their viewpoint discrimination claims, it concluded they were also likely to prevail on their equal protection claims. 1-ER-30-31.

The three-judge panel heard the appeals together and consolidated them for decision. The panel affirmed the Southern District's dismissal and reversed the Central District's order granting preliminary injunction.

## REASONS FOR REHEARING

## I. THE PANEL DECISION CONFLICTS WITH THE SUPREME COURT'S SECOND AMENDMENT PRECEDENTS

1. The right to purchase arms is coextensive with the Second Amendment's text guaranteeing a right to keep and bear arms. The Tennessee Supreme Court made that unremarkable finding in 1871. *Andrews v. State*, 50 Tenn. 165, 178 (1871)(The "right of keep[ing] arms … necessarily involves the right to purchase and use them in such a way as is usual."). *Andrews* has been consistently and favorably cited in the Supreme Court's line of cases interpreting Second Amendment rights. *Heller*, 554 U.S. at 614,

629; *Bruen*, 597 U.S. at 54-55. Though flawed in other ways, this circuit's precedents also stand for that proposition. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017)(en banc).

The Supreme Court, most recently in *Bruen*, has rejected the use of multi-step, interest-balancing tests to adjudicate Second Amendment claims. The correct analysis begins and ends with the Second Amendment's text and history. *Bruen*, 597 U.S. at 19. So when faced with a Second Amendment claim, courts must first ask if the restricted conduct is within the Second Amendment's "plain text." *Id.* at 17, 24. If it is, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. That is the *Bruen* test, left undisturbed in *United States v. Rahimi*, __ U.S. __, 2024 WL 3074728 (June 21, 2024). The use of a "meaningful restraint" test has no place in a post-*Bruen* analysis.

Before *Bruen*, federal courts struggling to interpret *District of Columbia v. Heller*, 554 U.S. 570 (2008), might be excused for the false start that evolved into a multistep judicial-balancing test—even though the *Bruen* Court emphasized that it was merely applying *Heller*. *Id.* at 17-18. Today, lower courts are no longer entitled to the benefit of the doubt. In abrogating the two-step test that had taken root after *Heller*, the Supreme Court noted that "[s]tep one of the predominant framework [was] broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 19. The Supreme Court unequivocally *did not* countenance merely shifting a judicial interest-balancing from step-two of the defunct test to step-one of a

new test. The *Bruen* Court held fast that "*Heller* and *McDonald* do not support applying means-ends scrutiny in the Second Amendment context," period. *Id.*

By demanding plaintiffs prove that a challenged law imposes a "meaningful constraint" on Second Amendment conduct before engaging in *Bruen*'s text-and-history analysis, the panel openly defies *Bruen.* Op.21-25. Indeed, the panel's test strikes at the heart of the Supreme Court's modern Second Amendment jurisprudence.

> The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.

*Heller*, 554 U.S. at 634-35. *See also Bruen*, 597 U.S. at 22-23. The panel's "meaningful constraint" analysis is a thinly veiled judicial balancing test applied to commercial restrictions on acquiring the arms necessary to exercise Second Amendment rights. It has no place at the threshold—or at any other step—of the analysis under *Bruen.*

The "meaningful constraint" test emerged from a line of cases in this circuit that culminated most recently in *Teixeira*, which was published five years before *Bruen. See also Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016); *Jackson*, 746 F.3d 953; *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). This line of cases relied on the two-step approach to Second Amendment claims the Supreme Court abrogated in *Bruen.* Because the panel's Second Amendment analysis turns on the "meaningful constraint" language and analogies found in *Teixeira*, Op.21-25, en banc review is necessary to clarify what—if any—parts of this line of cases are salvageable after *Bruen.*

7

En banc consideration is necessary to ensure circuit uniformity. This Court recently granted en banc review in a successful Second Amendment challenge to a Hawaii statute in *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), *reh'g granted*, 93 F.4th 1150 (9th Cir. 2024). Hawaii raised the issue of what threshold showing is required under *Bruen*'s Second Amendment analysis. As the panel opinion here essentially treats the "meaningful constraint" requirement as a threshold analysis, the *Teter* en banc decision may provide insight into how Second Amendment cases should proceed in this circuit after *Bruen*.

2. Even if a "meaningful constraint" test is appropriate as part of a standing (cognizable injury that can be remedied by court action) analysis, Petitioners made that showing. The panel's opinion says that Petitioners "essentially conceded" the Challenged Statutes do not "meaningfully constrain" their rights. Op.4-5, 19. This strawman is plausible only if one takes snippets from oral arguments out of context. Counsel's arguments that having to prove a "meaningful constraint" on Second Amendment rights forms no part of the *Bruen* analysis and is therefore irrelevant, was a correct statement of the law. The panel's attempt at literalism, by asking whether that would cover burdening Petitioners with shopping for guns across the street, cannot be bootstrapped into a concession. Furthermore, the panel's finding contradicts the record.

The Southern District appeal came after dismissal under Rule 12. No evidence was taken, and both the district and circuit courts must construe the complaint "in the light most favorable to the plaintiffs, taking all allegations as true, and drawing all reasonable inferences from the complaint in [their] favor." *Doe v. United States*, 419 F.3d

1058, 1062 (9th Cir. 2005). This includes allegations that the defendants refused to contract with B&L to host gun shows at the Del Mar Fairgrounds after AB 893 became law and that B&L could find no adequate private venue to host its gun show. S.D.Cal.App.2-ER-174-75. The Central District appeal came after a preliminary injunction compelled the fairgrounds to host gun shows, thus proving that the cognizable injury required judicial intervention.

In the Southern District case, Judge Battaglia and the appellate court performed their *Bruen*-forbidden "meaningful constraint" test despite the presumed-true allegations in the operative complaint. Contrast this with the supplemental *Bruen* briefing and full hearing Judge Holcomb conducted in the Central District case. Judge Holcomb made a threshold finding that the Challenged Statutes burden Second Amendment rights under his own "*Bruen* Step-One Analysis." 1-ER-21-24. He was the only judge authorized to make findings of fact outside the operative complaints, and to date, he is the only judicial officer who has done so. His factual findings can be disturbed only upon a showing of clear error, Fed. R. Civ. P. 52(a)(6), and his conclusions of law must be accorded substantial deference and only reversed on appeal for abuse of discretion, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

The panel's failure to reconcile Judge Holcomb's meticulous and presumptively correct factual findings is itself clear error. Indeed, the panel made the same errors that Justice Thomas observed in his dissent from the denial of certiorari in *Silvester*: "[The Ninth Circuit] upheld California's 10-day waiting period for firearms based solely on its own "common sense." (Citation omitted.) It did so without requiring California to

submit relevant evidence,… and without acknowledging the District Court's factual findings. This deferential analysis was indistinguishable from rational-basis review." 583 U.S. 1139, 1140 (Feb. 20, 2018)(Thomas, J., dissenting).

> [T]he Ninth Circuit ignored several ordinary principles of appellate review. While rational-basis review "is not subject to courtroom factfinding," (citation omitted), intermediate scrutiny is. And here, the District Court … made several findings of fact. The Ninth Circuit was supposed to review those findings for clear error. *See* Fed. Rule Civ. Proc. 52(a)(6). Yet the Ninth Circuit barely mentioned them. And it never explained why it had the "definite and firm conviction" that they were wrong.

*Id.* at 1147.

To paraphrase Justice Thomas: the panel's "deviation from ordinary principles of law is unfortunate, though not surprising. Its dismissive treatment of petitioners' challenge is emblematic of a larger trend…," one of "resisting th[e] Court's decisions in *Heller* and *McDonald*" and "failing to protect the Second Amendment to the same extent that they protect other constitutional rights." *Id.* at 1147-48; *Duncan v. Bonta*, 19 F. 4th 1087 (9th Cir. 2021)(Van Dyke, J., dissenting)("[F]rom storage restrictions to waiting periods to ammunition restrictions to conceal carry bans to open carry bans to magazine capacity prohibitions—the common thread is our court's ready willingness to bless any restriction related to guns.") En banc rehearing is necessary to ensure circuit uniformity in following both substantive and procedural law in all cases—even cases adjudicating unpopular rights.

3.    Even by its own terms, the panel failed to perform a meaningful "meaningful constraint" analysis—which, if earnestly applied, is indistinguishable from the "undue burden" test for unenumerated abortion rights. While Petitioners reject the

premise that any balancing test is appropriate here, the panel failed to incorporate even well-established precedent explaining what an "undue burden" test for the previously protected right to abortion would look like if applied to the Second Amendment. *Cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

The "undue burden" test itself rests on sound reasoning, but only if judicial balancing is appropriate. Its most thorough exposition is found in *Whole Women's Health v. Hellerstedt*, 579 U.S. 582 (2016). There, the Supreme Court listed 15 data points courts must balance to analyze whether a law imposes a "meaningful constraint" on a woman's right to obtain an abortion. *Id.* at 593-95. The list included such elements as how many people the regulations will impact, the reduction in locations to exercise rights, the distance people must travel to access the right and other barriers, whether the regulation addresses public safety and lowers risks, and the cost of compliance. *Id.*

As one example, the panel held there is no "meaningful constraint" on commerce in arms if the element of "acceptance" for sales must take place off state property. Op.24-25. Presumably, "acceptance" can be made via cell phone. This means the Challenged Statutes require gun buyers at gun shows to walk across the street to "accept" an offer. Then the buyer may return to the fairgrounds to complete paperwork, tender payment, and begin the background check. They must still pick up the gun at a brick-and-mortar store 10 days later, after complying with other state-imposed conditions on the sale of arms. Remove the cell phone, and a gun sale initiated at a gun show requires two trips to the brick-and-mortar store—instead of one—to take possession. This absurd series of events to engage in ordinary activities rivals Lewis

Carroll's imagination, and it would not have been tolerated under the abortion "meaningful constraint" analysis just two years ago.

## II. THE PANEL DECISION CONFLICTS WITH THIS CIRCUIT'S COMMERCIAL SPEECH DOCTRINE AS APPLIED TO GUN SHOWS

Commercial speech receives First Amendment protection if it is not misleading and concerns lawful activity. *Cent. Hudson*, 447 U.S. at 563-64.[3] Burdens on such speech are constitutional *only* if they directly advance a substantial government interest and are not broader than necessary to serve that interest. *Id.* at 564. The Challenged Statutes are *far* broader than necessary. Instead of simply enforcing California's laws regulating the sales of lawful products without restricting speech, the Challenged Statutes ban sales of all firearms, ammunition, and firearm parts on public property—and the commercial speech associated with such sales. This defies common sense and circuit precedent.

Gun show litigation has been kicking around the Ninth Circuit for decades. In 1995, Santa Clara County tried to ban gun shows through a lease provision banning the sale—but not possession—of firearms at its fairgrounds. This Court held that a ban on the "sale" of firearms was overbroad because it abridged commercial speech associated with the sale of lawful products. *Nordyke 1997*, 110 F.3d at 713. Further, because the ordinance was "not a ban on gun shows ... it merely reflect[ed] certain concerns about the proliferation of guns and their use in the commission of crimes, while permitting the continuation of gun shows." *Id.* at 713. It "achieves nothing in the way of curtailing the overall possession of guns," and thus did not directly advance the government

---

[3] Petitioners disagree with the panel's "pure" speech and free association analyses. But since mere disagreement is not grounds for en banc review, and without waiving those claims, they leave those arguments for another day.

interest. *Id.* Next, Alameda County banned possession—but not sales—of guns at gun shows. After more than a decade of litigation, the county reversed its interpretation of its ordinance to allow "properly secured" guns as commercial products at gun shows. *Nordyke v. King*, 681 F.3d 1041, 1045-46 (9th Cir. 2012). Since gun sales were never forbidden, the Nordykes' gun shows resumed at Alameda Fairgrounds. *Nordyke v. King*, 681 F.3d at 1045-46. Most recently, the 22nd DAA imposed a moratorium on gun shows at the Del Mar Fairgrounds. The moratorium was struck down on First Amendment and equal protection grounds. *B&L Prods., Inc., v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226, 1249 (S.D. Cal. 2019).

Now California is getting into the act by outlawing sales—but not possession—of guns on public property. This is a clone of *Nordyke 1997*. The analysis of the Challenged Statutes must thus begin with what is already settled law in this circuit: California may not ban the sale of firearms (and ammunition)—which are still lawful products—at gun shows that are held at fairgrounds open for public use. *Id.* at 710. The only new wrinkle since 1997 is the Supreme Court's Second Amendment jurisprudence and its directive to analyze Second Amendment claims under the doctrines articulated in *Bruen*, which necessarily forms part of the *Central Hudson* analysis of commercial speech about the sale of lawful products.

Despite these precedents, the panel upheld the Challenged Statutes, taking the breathtaking and (as far as Petitioners can tell) unprecedented step of declaring that communicating "acceptance" as part of the contract for the sale of a lawful product may be banned on public property. Op.13-14. Of course, the mere act of "exchanging a gun for money" is not speech. *Nordyke 1997*, 110 F.3d at 710. But exchanging a gun

for money at a gun show is *already* forbidden in California because all firearms sales are subject to a 10-day waiting period and a background check. Cal. Penal Code §§26815, 27540. This is true no matter where the transaction is initiated. Cal. Penal Code §27310 (transfers at gun shows must comply with state and federal law); *id.* §26805 (transfer at any location except the dealer's licensed premises is prohibited, but the dealer may prepare documents at a gun show); *id.* §27545 (all arms transactions must be processed through a licensed dealer).

Judge Holcomb described how this bifurcation of firearm sales applies here. In response to the State's insistence that the "act of exchanging money for a gun is not 'speech,'" *Nordyke 1997*, 110 F.3d at 710, he held that the Challenged Statutes must, at a minimum, "implicate commercial speech by restricting the sale of otherwise legal firearms at the [OC] Fairgrounds." 1-ER-016. Otherwise, as to firearm sales, the Challenged Statutes would do nothing at all. Indeed, even "assuming that merely exchanging money for a firearm is not speech, the *sales* regulated by [the Challenged Statutes] do not involve the physical exchange of a weapon." 1-ER-016. That is because, even without the Challenged Statutes, "sales made at California gun shows must be completed both temporally and physically removed from the show itself." 1-ER-016. The trial court thus found that the Challenged Statutes "unmistakably regulate commercial speech." 1-ER-016.

The panel opinion rejected the Central District's factual findings on this point, substituting its own factual finding in violation of Rule 52(a)(6). Furthermore, the panel opinion conflicts with *Nordyke 1997*, which protects the "sale" of lawful firearms at gun shows—conduct that necessarily includes the speech required to communicate offer

14

and acceptance. And, having held that the Challenged Statutes do not ban gun shows, but restrict only "acceptance" of sales, the opinion flouts *Nordyke 1997*'s holding that a ban on "sales," but not gun shows, does not directly advance the government's purported public safety interest. *Id.*

## III. THE PANEL DECISION IGNORES PETITIONERS' EQUAL PROTECTION CLAIMS IN CONFLICT WITH SUPREME COURT PRECEDENT

Supreme Court precedent holds that *both* the Equal Protection Clause *and* the First Amendment forbid the government from granting "the use of a forum to people whose views it finds acceptable but deny[ing] use to those wishing to express less favored or more controversial views." *Mosley*, 408 U.S. at 95-96. Furthermore, if unequal treatment occurs in the context of exercising a fundamental right *or* the government is motivated by animus toward a disfavored group, courts should apply heightened scrutiny. *See Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936); *Minn. Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983); *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617 (2018); *Romer v. Evans*, 517 U.S. 620 (1996).

The business model of gun shows is a case study in exercising rights under the First and Second Amendments. Petitioners alleged that their gun shows were targeted for disfavored treatment out of animus. California's hostility to all things connected to the Second Amendment was well-pleaded and documented on this record. The panel's refusal to address Petitioners' animus claim is inconsistent with Supreme Court precedent and is grounds for en banc rehearing.

## CONCLUSION

This Court should grant rehearing en banc.

Respectfully submitted,

Date: June 25, 2024

**MICHEL & ASSOCIATES, P.C.**

s/ Anna M. Barvir
_____
Anna M. Barvir
*Attorneys for Plaintiffs-Appellants B&L
Productions, Inc., Barry Bardack, Ronald J. Diaz,
Sr., John Dupree, Christopher Irick, Robert Solis,
Lawrence Michael Walsh, Captain Jon's Lockers,
LLC, L.A.X. Firing Range, Inc., California Rifle
& Pistol Association, Incorporated, and South Bay
Rod and Gun Club, Inc.*

*Attorneys for Plaintiffs-Appellees B&L
Productions, Inc., Gerald Clark, Eric Johnson,
Chad Littrell, Jan Steven Merson, California Rifle
& Pistol Association, Incorporated, Asian Pacific
American Gun Owners Association, Second
Amendment Law Center, Inc.*

Date: June 25, 2024

**LAW OFFICES OF DONALD KILMER, APC.**

s/ Donald Kilmer
_____
Donald Kilmer
*Attorney for Plaintiff-Appellant Second
Amendment Foundation*

*Attorney for Plaintiff-Appellee Second Amendment
Foundation*

16

## STATEMENT OF RELATED CASES

Pursuant to Federal Rules of Appellate Procedure 28-2.6, the undersigned attorney states the following:

I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case is: *Teter v. Lopez*, No. 20-15948, 76 F.4th 938 (9th Cir. 2023), *reh'g granted*, 93 F.4th 1150 (9th Cir. 2024). *Teter* is related to this case because the state of Hawaii has expressly raised the issue of the threshold showing required of those seeking to test the constitutionality of state laws under the Second Amendment after *Bruen*. The en banc decision in *Teter* may provide guidance about the Second Amendment analysis to be applied in this circuit in light of *Bruen*. *Teter* is set to be argued on June 25, 2024, in Seattle, Washington.

Date: June 25, 2024

**MICHEL & ASSOCIATES, P.C.**

s/ Anna M. Barvir
Anna M. Barvir
*Attorneys for Plaintiffs-Appellants B&L Productions, Inc., Barry Bardack, Ronald J. Diaz, Sr., John Dupree, Christopher Irick, Robert Solis, Lawrence Michael Walsh, Captain Jon's Lockers, LLC, L.A.X. Firing Range, Inc., California Rifle & Pistol Association, Incorporated, and South Bay Rod and Gun Club, Inc.*

*Attorneys for Plaintiffs-Appellees B&L Productions, Inc., Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, California Rifle & Pistol Association, Incorporated, Asian Pacific American Gun Owners Association, Second Amendment Law Center, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)**  | 23-55431 & 23-3793 |

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is (*select one*):

○ Prepared in a format, typeface, and type style that complies with Fed. R. App.
P. 32(a)(4)-(6) and **contains the following number of words**: | 4,200 | .

*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/Anna M. Barvir |  **Date** | Jun 25, 2024 |
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 11**                                                                 *Rev. 12/01/2021*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2024, an electronic PDF of PETITION FOR REHEARING EN BANC was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

Date: June 25, 2024                    s/ Anna M. Barvir

                                       Anna M. Barvir

# ATTACHMENT

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| B & L PRODUCTIONS, INC., DBA Crossroads of the West; BARRY BARDACK; RONALD J. DIAZ, Sr.; JOHN DUPREE; CHRISTOPHER IRICK; ROBERT SOLIS; LAWRENCE MICHAEL WALSH; CAPTAIN JON'S LOCKERS, LLC; L.A.X. FIRING RANGE, INC., DBA LAX AMMO; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC.; SOUTH BAY ROD AND GUN CLUB, INC.; SECOND AMENDMENT FOUNDATION, | No. 23-55431<br><br>D.C. No. 3:21-cv-01718-AJB-DDL<br><br><br>OPINION |
| *Plaintiffs-Appellants*, | |
| v. | |
| GAVIN NEWSOM, in his official capacity as Governor of the State of California and in his personal capacity; ROB BONTA, in his official capacity as Attorney General of the State of California and in his personal capacity; KAREN ROSS, in her official capacity as Secretary of California Department of Food & Agriculture and in her personal capacity; 22ND | |

DISTRICT AGRICULTURAL
ASSOCIATION; SUMMER
STEPHAN, in her official capacity as
District Attorney of San Diego
County; LONNIE J. ELDRIDGE, in
his official capacity as County Counsel
of San Diego County; DOES, 1-50,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

| B & L PRODUCTIONS, INC., DBA Crossroads of the West; CALIFORNIA RIFLE & PISTOL ASSOCIATION; GERALD CLARK; ERIC JOHNSON; CHAD LITTRELL; JAN STEVEN MERSON; ASIAN PACIFIC AMERICAN GUN OWNER ASSOCIATION; SECOND AMENDMENT LAW CENTER, INC.; SECOND AMENDMENT FOUNDATION, | No. 23-3793<br><br>D.C. No.<br>8:22-cv-01518-<br>JWH-JDE |
|---|---|

*Plaintiffs-Appellees*,

v.

GAVIN NEWSOM, in his official

capacity as Governor of the State of
California; ROB BONTA, in his
official capacity as Attorney General
of the State of California; KAREN
ROSS, in her official capacity as
Secretary of California Department of
Food & Agriculture and in her
personal capacity; 32ND DISTRICT
AGRICULTURAL ASSOCIATION,

*Defendants-Appellants*,

TODD SPITZER, in his official
capacity as District Attorney of
Orange County, DOES, 1-10,

*Defendants*.

Appeal from the United States District Court
for the Central District of California
John W. Holcomb, District Judge, Presiding

Argued and Submitted March 6, 2024
Pasadena, California

Filed June 11, 2024

Before: Richard R. Clifton, Holly A. Thomas, and Roopali
H. Desai, Circuit Judges.

Opinion by Judge Clifton

## SUMMARY[*]

### First and Second Amendments/Gun Shows

In two separate actions involving First and Second Amendment challenges brought by B&L Productions, Inc., an operator of gun shows in California, to statutes that bar the sale of guns on state property, the panel affirmed the district court's dismissal of B&L's claims in Case No. 23-55431 and vacated the district court's order granting B&L's motion for a preliminary injunction in Case No. 23-3793.

In Case No. 23-55431, B&L challenged a ban on firearm sales at the Del Mar Fairgrounds. In Case No. 23-3793, B&L challenged bans on firearm sales (1) at the Orange County Fairgrounds and (2) on all state property.

Addressing the First Amendment challenges, the panel held that because the challenged statutes solely restrict nonexpressive conduct—contracting for the sale of firearms—they are not subject to First Amendment scrutiny. The statutes do not prohibit offers to sell firearms but rather bar the acceptance of such offers, which is what determines when a contract becomes binding. Accepting an offer, an act that formally consummates a business transaction, is nonexpressive conduct and is not entitled to First Amendment protection. Moreover, the challenged statutes apply to all vendors and, therefore, do not have the effect of "singling out" those gun show participants who wish to engage in expressive activity.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Addressing the Second Amendment challenges, the panel determined that the plain text of the Second Amendment does not cover B&L's proposed conduct—namely, contracting for the sale of firearms and ammunition on state property. Moreover, B&L essentially conceded that the challenged statutes do not "meaningfully constrain" any individual's ability to keep and bear arms. B&L made no allegation that a ban on sales on state property would impair a single individual from keeping and bearing firearms, even after having an opportunity to amend its complaint.

## COUNSEL

Anna M. Barvir (argued), Tiffany D. Cheuvront, C.D. Michel, and Alexander A. Frank, Michel & Associates PC, Long Beach, California; Donald Kilmer, Law Offices of Donald Kilmer APC, Caldwell, Idaho; for Plaintiffs-Appellants.

Charles J. Sarosy (argued) and Nicole J. Kau, Deputy Attorneys General; Anthony R. Hakl, Lara Haddad, and R. Matthew Wise, Supervising Deputy Attorneys General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, Los Angeles, California; Katie A. Richardson and Timothy M. White, Office of County Counsel, County of San Diego, San Diego, California; for Defendants-Appellees.

Joseph Greenlee, Greenlee Law PLLC, McCall, Idaho; David B. Kopel, Independence Institute, Denver, Colorado; for Amici Curiae Citizens Committee for the Right to Keep and Bear Arms and Independence Institute.

## OPINION

CLIFTON, Circuit Judge:

These cases involve challenges brought by B&L Productions, Inc., and associated stakeholders ("B&L") against state officeholders tasked with enforcing various California statutes (the "Challenged Statutes") that bar the sale of guns on state property. In both cases, B&L asserts that the Challenged Statutes restrict protected speech in violation of the First and Fourteenth Amendments and infringe on the right to keep and bear arms under the Second Amendment.

In Case No. 23-55431, which concerns B&L's challenge to a ban on firearm sales at the Del Mar Fairgrounds, the district court dismissed B&L's lawsuit under Federal Rule of Civil Procedure 12(b)(6), holding that B&L had failed to state a claim that the ban violates its constitutional rights. Conversely, in Case No. 23-3793, which concerns B&L's challenge to bans on firearm sales (1) at the Orange County Fairgrounds and (2) on all state property, the district court granted B&L's motion for a preliminary injunction, holding that B&L was likely to succeed on the merits of all its claims.

We conclude that the Challenged Statutes do not infringe on B&L's constitutional rights. Because the statutes solely restrict nonexpressive conduct—contracting for the sale of firearms—they are not subject to First Amendment scrutiny. As well, B&L essentially concedes that the Challenged Statutes do not "meaningfully constrain" any individual's ability to keep and bear arms. The Challenged Statutes therefore do not implicate the plain text of the Second Amendment.

We affirm the district court's dismissal of B&L's claims in Case No. 23-55431. We vacate the grant of a preliminary injunction in Case No. 23-3793.

## I. Background

Plaintiff B&L Productions, Inc., operates gun shows in California under the name Crossroads of the West. Its gun shows are centered on the sale of firearms, but they also involve lectures, classes, and the sale of other goods. B&L hosts gun shows at the Del Mar Fairgrounds in San Diego County and the Orange County Fair & Event Center ("Orange County Fairgrounds"), which are owned by the State of California and operated by the 22nd and 32nd District Agricultural Associations (singularly, "DAA"), respectively.

In 2018, the 22nd DAA imposed a one-year moratorium on gun shows at the Del Mar Fairgrounds. After B&L filed suit, a district court held that an explicit ban on gun shows likely violates the First and Fourteenth Amendments. *B & L Prods., Inc. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226, 1236, 1243-50 (S.D. Cal. 2019). In April 2020, the parties reached a settlement, allowing B&L to book gun shows but reserving the right for the 22nd DAA to change its policies in the future.

In October 2019, while that litigation was underway, California passed AB 893, which bars any "officer, employee, operator, lessee, or licensee" of the 22nd DAA from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds." The law on its face does not prohibit gun show vendors from advertising the firearms they are offering for sale. It also does not prevent attendees from taking immediate

possession of a gun purchased at a gun show,[1] which B&L concedes was already banned by other California statutes that it does not challenge here.[2] Instead, AB 893 prevents vendors and gun show attendees from consummating a contract to purchase firearms or ammunition while at the Del Mar Fairgrounds. Whereas visitors to the Fairgrounds could previously agree to purchase firearms and immediately begin the background check process, Cal. Penal Code § 26805(b)(1), AB 893 bars attendees from completing those preliminary steps until they have left the Fairgrounds.

The April 2020 settlement had acknowledged the passage of AB 893 and noted that the agreement's terms were subject to the statute's requirements. Based on AB 893, the 22nd DAA subsequently refused to contract with B&L to host any gun show at which firearms and ammunition were to be sold.

---

[1] The appellees represented at oral argument that the Challenged Statutes do prevent gun show attendees from taking immediate possession of *ammunition*, which was previously lawful.

[2] As B&L asserts, several provisions of the California Penal Code together prevent firearm transfers from taking place at gun shows. Section 27545 requires all firearm transactions to be processed through a licensed dealer. Section 26805 states that firearm dealers can only transfer sold firearms at their licensed premises, although it allows a dealer to prepare documents at a gun show. Section 26815(a) imposes a ten-day waiting period for gun purchases. Finally, Section 27310 requires all firearm transfers at gun shows to comply with state law, including Sections 26805 and 27545. B&L makes clear that it "do[es] not challenge these laws" or their resulting prohibition on taking immediate possession of firearms purchased at gun shows.

B&L filed suit in the Southern District of California against Governor Gavin Newsom and other state officials[3] (the "State Defendants") on October 4, 2021, asserting that AB 893 violated its rights under the First and Fourteenth Amendments. Alleging that its gun shows are not economically viable without firearm sales, B&L asserted that AB 893 therefore has "the intention and effect of shuttering gun show events altogether," along with their attendant pro-gun speech. The district court dismissed the complaint with leave to amend, concluding that AB 893 does not ban gun shows but instead simply prohibits the sale of guns on state property.

B&L filed an amended complaint on August 31, 2022, in which it added a Second Amendment claim based on the Supreme Court's opinion in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The district court dismissed the amended complaint in its entirety, holding that B&L had failed to state any claim upon which relief could be granted. B&L appealed that decision.

Meanwhile, in 2021, California passed SB 264, which imposes the same restrictions as AB 893 on the Orange County Fairgrounds. The next year, the state passed SB 915, which expanded the ban on firearm sales to all state property. B&L sued the State Defendants[4] in the Central District of

---

[3] Along with Newsom, B&L initially sued California Attorney General Rob Bonta, as well as the San Diego District Attorney and County Counsel, the 22nd DAA, and California Secretary of Food & Agriculture Karen Ross. The district court dismissed its claims against Newsom, Bonta and Ross, and B&L does not challenge that determination on appeal.

[4] In the Orange County case, B&L sued Newsom, Bonta, Ross, the Orange County District Attorney, and the 32nd DAA.

California on August 12, 2022, challenging SB 264 and SB 915 under the same legal theories as in the Del Mar case. The district court granted B&L's motion for a preliminary injunction on October 30, 2023, holding that B&L was likely to succeed on the merits of its claims under the First and Second Amendments. After the State Defendants appealed that order, we coordinated the two cases for oral argument and ultimately consolidated them for decision.

## II. Discussion

We have jurisdiction under 28 U.S.C. § 1291. We review de novo the district courts' legal determinations. *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021) (motion to dismiss); *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016) (preliminary injunction).[5] In each case, B&L argues that the Challenged Statutes impermissibly infringe on protected speech[6] and that a ban on firearm sales on state property violates the plain text of the Second Amendment.

---

[5] The two cases involve different standards of review for questions of fact. A court ruling on a motion to dismiss "accept[s] the factual allegations of the complaint as true and construe[s] them in the light most favorable to the plaintiff." *Mudpie, Inc.*, 15 F.4th at 889. In contrast, we review the factual findings underpinning a preliminary injunction for clear error. *Puente Ariz.*, 821 F.3d at 1103. These differing standards do not affect our analysis: even accepting B&L's factual allegations and the Orange County district court's findings of fact as true, B&L has failed to establish a constitutional violation.

[6] In each case B&L has also alleged violations of the Equal Protection Clause, but it concedes that its Equal Protection claims essentially duplicate its First Amendment claims, as B&L's Equal Protection claims rely on its assertion that the Challenged Statutes target pro-gun speech. We therefore do not separately address those arguments.

### A. First Amendment

B&L contends that the Challenged Statutes violate its rights under the First Amendment. As the party asserting such a claim, B&L bears the burden "to demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). To meet this burden, B&L raises two separate arguments. First, it asserts that the Challenged Statutes are an attempt to ban gun shows and the pro-gun "pure speech" that occurs at them. Alternatively, B&L argues that contracting for the sale of firearms is itself protected commercial speech, and that a restriction on such contracts therefore implicates the First Amendment.

We need not address the distinction between commercial and pure speech, as B&L fails to establish that the Challenged Statutes regulate any speech cognizable under the First Amendment. The First Amendment only applies when "conduct with a 'significant expressive element' drew the legal remedy or the [statute] has the inevitable effect of 'singling out those engaged in expressive activity.'" *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706-07 (1986)). Because the Challenged Statutes do not directly or inevitably restrict any expressive activity, they do not implicate the First Amendment.

### 1. Directly Regulated Conduct

Our first inquiry is to determine what precise conduct "drew the legal remedy" of the Challenged Statutes. That question is a core point of contention. B&L asserts that the statutes regulate all "the commercial speech associated with the sale of an otherwise lawful product," including offers to sell firearms, which we have held implicate the First

Amendment. *Nordyke v. Santa Clara County*, 110 F.3d 707, 710 (9th Cir. 1997) (*Nordyke 1997*).[7] Conversely, the State Defendants characterize the Challenged Statutes as solely regulating "the act of exchanging money for a gun," which we held "is not 'speech' within the meaning of the First Amendment."[8] *Id.* at 710. Neither characterization is sufficiently precise.

The Challenged Statutes simply prohibit "contract[ing] for . . . the sale of any firearm or ammunition" on state property.[9] On its face, that language solely regulates the moment at which a binding contract is formally consummated. The statutes therefore do not prohibit offers to sell firearms—an offer alone does not form a contract,

---

[7] In *Nordyke 1997*, Santa Clara County's addendum explicitly prohibited the "offering for sale" of firearms and ammunition, language not present in the Challenged Statutes. 110 F.3d at 708-09. Another problem in *Nordyke 1997* was that the County used a *lease* provision to "curtail[] commercial speech, rather than attempting to impose by proper legislative acts such restrictions on the sale of guns at gun shows not otherwise provided by, but consistent with, the applicable federal and state law." *Nordyke 1997*, 110 F.3d at 713. The court expressly reserved the question of whether a state could ban offers to sell firearms by statute. While we need not resolve that question, we note that conceptual similarity between commercial advertising and formal contract offers means that offers have a stronger argument for First Amendment protection than *acceptance* of such offers, which we hold does not constitute protected speech.

[8] Contrary to B&L's assertion, that holding is not dicta. We later noted that "[w]e have previously held that the act of exchanging money for a gun is not 'speech' for the purposes of the First Amendment." *Nordyke v. King*, 319 F.3d 1185, 1191 (9th Cir. 2003) (*Nordyke 2003*).

[9] The language regarding "authoriz[ing] or allow[ing]" firearm sales does not regulate conduct beyond contracting for the sale of firearms. It simply extends liability to state officials who allow such conduct to take place.

which is only "completed when the offer is made *and accepted*." *Norfolk & W. Ry. Co. v. Sims*, 191 U.S. 441, 447 (1903) (emphasis added). Because a contract can be consummated prior to delivery of the purchased product, the regulated conduct is likewise not "the act of exchanging money for a gun."[10] As acceptance is what determines when a contract becomes binding, the Challenged Statutes prohibit accepting an offer to sell firearms or ammunition on state property.

The Challenged Statutes' limited scope simplifies our inquiry, as acceptance of an offer is not entitled to First Amendment protection. The Supreme Court has held that "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Following *Sorrell*, our court has held that consummating a business transaction is nonexpressive conduct unprotected by the First Amendment. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) ("[T]he 'business agreement or business dealings' associated with processing a booking is not conduct with a 'significant expressive element.'" (quoting *Int'l Franchise Ass'n*, 803 F.3d at 408)). As acceptance of an offer is simply the act that formally consummates such a transaction, *Sims*, 191 U.S. at 447, it is likewise nonexpressive conduct. *Cf. Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring) ("[A]s offer and acceptance are communications incidental to the regulable transaction

---

[10] The immediate transfer of a firearm purchased at a gun show was already illegal in California, Cal. Penal Code §§ 26805, 27310, further indicating that delivery of firearms on state property is not what "drew the legal remedy," *Int'l Franchise Ass'n*, 803 F.3d at 408.

called a contract, . . . [restrictions on them] cannot be said to have enacted a limitation on freedom of speech or the press subject to First Amendment scrutiny."). B&L has therefore failed to establish that "conduct with a 'significant expressive element' drew the legal remedy" of the Challenged Statutes. *Int'l Franchise Ass'n*, 803 F.3d at 408.[11]

### 2. Inevitable Effect

B&L argues that even if the Challenged Statutes do not directly regulate protected speech, they indirectly implicate the First Amendment by jeopardizing the pro-gun speech that occurs at gun shows. B&L emphasizes that at gun shows, "[o]rganizations share information, speakers give lectures, trainers hold classes, and patrons discuss gun

---

[11] While B&L characterizes acceptance as part of "the commercial speech associated with the sale of an otherwise lawful product," it cites no authority for that proposition and fails to identify a single case where regulations on acceptance were subjected to First Amendment scrutiny. Indeed, as acceptance is nonexpressive conduct, it necessarily cannot be considered "commercial speech." The commercial speech doctrine does not expand the scope of the First Amendment beyond expressive conduct; it instead ensures that such conduct receives protection even if the motivations behind it are entirely commercial. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 762 (1976) ("Our question is whether speech which does 'no more than propose a commercial transaction' is so removed from any 'exposition of ideas' . . . that it lacks all protection." (citations omitted)). Regardless, regulations on acceptance do not implicate any of the principles underlying the commercial speech doctrine, which protects "the free flow of commercial information" from regulations that would "keep[] the public in ignorance." *See id.* at 765, 770. Contract formation is not about keeping the public informed; it is a private interaction between parties.

rights," and "[c]andidates for office even attend to discuss politics, government, and law with their constituents."

On their face, the Challenged Statutes do not restrict any of those forms of speech. A "celebration of America's 'gun culture,'" in the words of one of B&L's briefs, can still take place on state property, as long as that celebration does not involve contracts for the sale of guns. B&L nevertheless argues that gun shows "will disappear" "[w]ithout the anchor of commerce in firearms," so a restriction on the latter inherently infringes on gun-related speech. It notes that "[m]any (maybe most) of the people who attend gun shows are there to engage in commerce with experienced firearm retailers," but that "[i]f licensed retailers cannot lawfully sell their products at these events, there is little financial incentive for [those retailers] to attend."

Even assuming B&L's allegations are accurate,[12] the indirect economic impacts it alleges do not implicate the

---

[12] We must accept that B&L may stop hosting gun shows in the absence of firearm sales, but its assertion that no other entity would step in to provide a forum for pro-gun speech on state property is speculative. *See, e.g.*, *Graham-Sult v. Clainos*, 756 F.3d 724, 752 (9th Cir. 2014) ("Plaintiffs base their remaining arguments on speculation and inferences."). Indeed, B&L's representation to both district courts that it itself "has offered to attempt to hold events without sales of firearms, ammunition, or firearm precursor parts" appears to undermine its assertions.

On that front, B&L alleges that in response to these offers, both DAAs "dragged [their] feet and refused to provide dates for" future events. The 32nd DAA asserts that it is willing to coordinate with B&L to schedule gun shows that comply with the Challenged Statutes, but that B&L has not reached out since late 2021. Going forward, if the DAAs refuse to schedule gun shows without gun sales, B&L might have grounds for an

First Amendment. Regulations that do not directly regulate expressive activity are only scrutinized if they have "the inevitable effect of 'singling out those engaged in expressive activity.'" *Int'l Franchise Ass'n*, 803 F.3d at 408 (quoting *Arcara*, 478 U.S. at 706-07). The mere fact that a regulation may have economic implications for the feasibility of certain speech does not meet that standard. *See HomeAway.com, Inc.*, 918 F.3d at 685 ("The 'inevitable effect of the [Ordinance] on its face' is to regulate nonexpressive conduct—namely, booking transactions—not speech." (alteration in original) (quoting *Sorrell*, 564 U.S. at 565)); *Nordyke 2003*, 319 F.3d at 1191 (a law could be unconstitutional when it "interfere[s] with speech itself, not [through] the hindering of actions (e.g., sales) that are not speech"); *Sorrell*, 564 U.S. at 567 ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."); *cf. Mobilize the Message, LLC v. Bonta*, 50 F.4th 928, 935-37 (9th Cir. 2022) (statute that classified doorknockers and signature gatherers as employees did not infringe First Amendment rights, even if it impacted the employer's ability to speak by increasing labor costs). B&L may choose not to provide a forum for pro-gun speech if it decides gun shows are not profitable without firearm sales, but doing so would be its own decision, not the "inevitable effect" of the Challenged Statutes. *See HomeAway.com*, 918 F.3d at 685 ("Contrary to the Platforms' claim, the Ordinance does not 'require' that they monitor or screen advertisements. It

---

as-applied challenge against the DAAs, although B&L represented at oral argument that it is not presently maintaining such a challenge. In any event, any anti-gun animus on the part of the DAAs does not support B&L's facial challenge, given that the DAAs had no role in the drafting process.

instead leaves them to decide how best to comply with the prohibition on booking unlawful transactions.").

Because the Challenged Statutes, moreover, apply to all vendors, including those who may wish to sell guns for purely financial reasons or other purposes, they do not have the effect of "singling out" those gun show participants who wish to engage in expressive activity. In other words, the impact of the Challenged Statues does not differ based on whether a party is engaged in such activity. *See id.* at 685-86 (platforms would be impacted based on whether they process transactions, not whether they host commercial speech); *Arcara*, 478 U.S. at 706-07. Even if the ultimate result of the Challenged Statutes is that gun shows on state property are no longer viable, the gun show vendors who are not engaged in pro-gun expression—both those who sell guns for non-expressive reasons and those who sell things like snacks and memorabilia—would be just as impacted as those who are.

When "the only inevitable effect, and the stated purpose"[13] of a statute is to regulate nonexpressive conduct, our inquiry is essentially complete. *HomeAway.com, Inc.*, 918 F.3d at 685. In such circumstances, "a court may not conduct an inquiry into legislative purpose or motive beyond what is stated within the statute itself."[14] *Id.* The Supreme

---

[13] The stated purpose of the Challenged Statutes is to prevent "dangerous incidents" like those in nearby states—"an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines"—all of which relate to the sale of firearms rather than speech.

[14] B&L cites *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61 (2022), for the proposition that "[i]f there is evidence

18 B & L PRODUCTIONS, INC. V. NEWSOM

Court has disclaimed the idea that "legislative motive is a proper basis for declaring a statute unconstitutional" in the absence of a direct impact on protected speech. *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968); *cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) ("This Court has long disfavored arguments based on alleged legislative motives.").

Despite that clear precedent, B&L asserts that anti-gun animus underlies the Challenged Statutes,[15] relying on a small number of statements from California officials. As *O'Brien* made clear, courts will not invalidate a statute that is "constitutional on its face, on the basis of what fewer than a handful of [legislators] said about it." 391 U.S. at 384 ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it . . . ."). A party asserting that a statute is a pretext for suppression of First Amendment protected expression must demonstrate that the statute restricts such expression. *Cf.*

---

that an impermissible purpose or justification underpins a facially content-neutral restriction, . . . that restriction may be content based." *Id.* at 76. That doctrine applies when a statute actually regulates speech and a court has to determine whether the statute targets certain content. *Id.* As the Challenged Statutes do not directly or inevitably impact speech, *City of Austin* is inapposite.

[15] While some statements describe the Challenged Statutes as a "ban on gun shows," such an interpretation cannot be squared with the plain text of the Challenged Statutes, which only restricts firearm sales. *See, e.g.*, *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1082 (9th Cir. 1986) ("When interpreting a statute, the plain meaning of the words used is controlling absent 'a clearly expressed legislative intent to the contrary.'" (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981))). That any legislator described the Challenged Statutes as a ban on gun shows demonstrates only that legislator's personal understanding of the statutes' purpose.

*Arcara*, 478 U.S. at 707 n.4 (considering potential pretext arguments against a statute that shuttered bookstores). It is virtually inevitable that elected officials will have underlying ideological views on political issues. But even if California legislators hold personal animus against pro-gun speech, the statutes they enact only implicate the First Amendment if that animus manifests as legislation with the direct or inevitable impact of restricting speech.[16] *See*

---

[16] Motivation can, in contrast, be relevant in examining efforts by government officials to reach beyond their authority to coerce others into doing something that the official cannot regulate directly. The Supreme Court's recent decision in *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. ___, 2024 WL 2751216 (May 30, 2024), illustrates an important distinction. In that case the Court held that the NRA had plausibly alleged that the superintendent of the New York Department of Financial Services violated the First Amendment by coercing entities regulated by the Department to terminate their business relationships with the NRA in order to punish or suppress its advocacy. The difference between that case and ours is that the Department did not have the authority to accomplish the result it sought by direct regulation. As the Court stated, the First Amendment problem with the Department's approach was that it allowed government officials to "expand their regulatory jurisdiction to suppress the speech of organizations that they have no direct control over." *Id.* at *11. It reiterated that distinction by quoting its own precedent: "Ultimately, *Bantam Books* stands for the principle that *a government official cannot do indirectly what she is barred from doing directly*: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Id.* at *8 (emphasis added) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-69 (1963)).

The challenge in our case is different. B&L objects to statutes enacted by the Legislature, but it does not contest the Legislature's enactment of the statutes as beyond its authority to regulate state property. As discussed above, individual intent is not relevant to a facial challenge against a statute without the direct or inevitable impact of restricting speech.

*HomeAway.com, Inc.*, 918 F.3d at 685. As the Challenged Statutes have no such impact, B&L has failed to allege a First Amendment violation as a matter of law.

## B. Second Amendment

B&L also contends that the Challenged Statutes violate the Second Amendment. In *Bruen*, the Supreme Court held that a litigant invoking the Second Amendment must first establish that "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. As the plain text of the Second Amendment does not cover B&L's proposed conduct—namely, contracting for the sale of firearms and ammunition on state property[17]—B&L's argument necessarily fails.

The plain text of the Second Amendment directly protects one thing—the right to "keep and bear" firearms.

---

Although we therefore need not inquire into the motives of individual legislators, we note that the statements highlighted by B&L itself suggest that the authors of the Challenged Statutes were primarily concerned with commerce, rather than speech. Assemblymember Todd Gloria's contention that "California should in no way help to facilitate the sale of firearms" is focused on firearms commerce. Senator Dave Min similarly positioned SB 264 as demonstrating that California does not endorse "our taxpayer venues being used to sell more guns in our communities."

[17] While B&L suggests that its proposed conduct is the general "purchase of firearms," such a definition is not attuned to the actual activity that the Challenged Statutes regulate: namely, the sale and purchase of firearms and ammunition *on state property*. *Doe v. Bonta*, No. 23-55133, 2024 WL 2037144, at *5 (9th Cir. May 8, 2024) (proposed conduct is "what the plaintiffs wanted to do and what the challenged law prevented them from doing"). In particular, as discussed above, the proposed conduct is consummating a formal contract for firearms or ammunition on state property. *See Sims*, 191 U.S. at 447.

U.S. Const. amend. II. On its face, that language says nothing about commerce, let alone firearm sales on state property. To be sure, our court has consistently held that the Second Amendment also "protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc). While we held in *Teixeira* that the right to *sell* firearms is not a protected ancillary right,**[18]** *id.* at 673, 683, we acknowledged that unless the right to *acquire* firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless, *id.* at 677; *see Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, . . . and to purchase and provide ammunition suitable for such arms . . . .").

We nevertheless held in *Teixeira* that "gun buyers have no right to have a gun store in a particular location, at least as long as their access is not *meaningfully constrained*." *Teixeira*, 873 F.3d at 680 (emphasis added). We did not define "the precise scope of any such acquisition right under the Second Amendment," but held that a violation would require evidence that a statute "impedes . . . residents from acquiring firearms." *Id.* at 678.

---

[18] We reasoned that "[n]othing in the specific language of the Amendment suggests that sellers fall within the scope of its protection," and that Founding-era "Second Amendment analogues in state constitutions . . . nowhere suggest[ed] in their text that the constitutional protection extends to those who would engage in firearms commerce." *Teixeira*, 873 F.3d at 683. As this holding was based on the type of text-and-history analysis mandated by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Bruen*, it remains good law.

B&L argues that this holding involves the type of "interest-balancing inquiry" that *Bruen* proscribes. *Bruen*, 597 U.S. at 22 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008)). That assertion is inaccurate. At no point in *Teixeira* did we balance the litigants' competing interests, as we determined that it was unnecessary to apply any level of scrutiny. *Teixeira*, 873 F.3d at 679. Instead, we held that the plain text of the Second Amendment only prohibits meaningful constraints on the right to acquire firearms. *Id.* at 680.

Reading such a limit into the extent to which the Second Amendment's plain text protects ancillary rights is fully consistent with *Bruen*. The Supreme Court has made clear that the Second Amendment does not speak to all restrictions that impact firearms in any way. *See Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) ("[T]he right secured by the Second Amendment . . . was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (quoting *Heller*, 554 U.S. at 626)). Instead, it secures the right to firearms "for lawful purposes, most notably for self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 781 (2010). Ancillary rights are protected to the extent necessary to serve those purposes; otherwise, the Second Amendment is not implicated by restraints on such rights.[19]

The Supreme Court itself has suggested that the ancillary right at issue in these cases—the right to acquire firearms—

---

[19] Such an interpretation also conforms with logic: if the Second Amendment's full protections apply to any restriction that implicates the ability to purchase firearms, laws of general applicability that restrict all forms of commerce in a given area could be subjected to exacting Second Amendment review.

only implicates the Second Amendment in limited circumstances. The Court explicitly framed "laws imposing conditions and qualifications on the commercial sale of arms" as "*presumptively lawful* regulatory measures." *Heller*, 554 U.S. at 626-27 & n.26 (emphasis added); *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring). For any law to be "presumptively lawful," it necessarily must not implicate the plain text of the Second Amendment. Otherwise, *Bruen* makes clear that the Constitution would "presumptively *protect*[] that conduct," and the government would bear the burden of identifying a historical tradition of similar regulation. *Id.* at 17 (emphasis added). The most reasonable interpretation of that passage is that commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test. While the Court did not specify what is required to overcome that presumption, requiring that a regulation "meaningfully constrain[]" the right to keep and bear arms for the purpose of self-defense faithfully tracks the Second Amendment's plain text. *Teixeira*, 873 F.3d at 680.

In assessing whether particular "laws imposing conditions and qualifications on the commercial sale of arms" implicate that right, the approach we took in *Teixeira*—whether a challenged regulation meaningfully impairs an individual's ability to access firearms—remains appropriate. Under that approach, we have held that a ban on all sales of a certain type of gun or ammunition in a region generally implicates the Second Amendment, as such a ban meaningfully constrains the right to keep and bear that firearm or ammunition. *See, e.g.*, *Jackson v. City & County of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014); *Teixeira*, 873 F.3d at 677. But a minor constraint on the precise locations within a geographic area where one can

acquire firearms does not. As we held in *Teixeira*, "the Second Amendment does not elevate convenience and preference over all other considerations," nor does it "guarantee[] a certain type of retail experience." *Teixeira*, 873 F.3d at 680 & n.13.

B&L essentially concedes that the Challenged Statutes do not "meaningfully constrain" the right to keep and bear arms. It makes no allegation that a ban on sales on state property would impair a single individual from keeping and bearing firearms, even after having an opportunity to amend its complaint to add one. B&L's implicit concession is unsurprising, as the record suggests that no individual's access to firearms would be limited. For instance, there are six licensed firearm dealers in the same zip code as the Orange County Fairgrounds. Merely eliminating one environment where individuals may purchase guns does not constitute a meaningful constraint on Second Amendment rights when they can acquire the same firearms down the street.

Indeed, B&L notes that "[g]un show vendors are often the same licensed vendors that have brick-and-mortar stores in the community[] [and] operate legally over the internet." Given that offers are not proscribed, attendees of gun shows in California can peruse such offers, leave the premises, and immediately order their desired goods from the vendor. Such a system does not meaningfully delay the delivery of purchased firearms—B&L acknowledges and expressly "do[es] not challenge" existing laws that already require gun show attendees who purchase a firearm to "pick up their

firearm offsite" after a waiting period.[20] The only thing attendees can no longer do is *agree* to buy firearms while physically present at the gun show. Nothing in the Second Amendment's text provides a right to the contrary.

## III.  Conclusion

We conclude that B&L has failed to establish that the Challenged Statutes violate its constitutional rights.[21] The district court's dismissal of Case No. 23-55431 is **AFFIRMED**. The preliminary injunction granted in Case No. 23-3793 is **VACATED**. Costs shall be awarded to the State Defendants in both cases.

---

[20] As noted above, this requirement did not apply to ammunition purchases, meaning that attendees were previously able to immediately receive ammunition they purchased at gun shows. That fact does not change our analysis, as no plaintiffs allege that the Challenged Statutes meaningfully constrain their ability to acquire ammunition.

[21] Because B&L failed to show even "serious questions going to the merits," we need not consider the other injunction factors in reversing the grant of a preliminary injunction in the Orange County case. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011)).

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST, et al., <br> Plaintiffs, <br> v. <br> GAVIN NEWSOM, in his official capacity as Governor of the State of California and in his personal capacity, et al., <br> Defendants. | Case No.: 21-cv-01718-AJB-DDL <br><br> **AMENDED ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** <br><br> **(Doc. Nos. 42)** |

Presently pending before the Court is a motion to dismiss, filed by Defendants Governor Gavin Newsom, Attorney General Rob Bonta, Secretary Karen Ross, and the 22nd District Agricultural Association (collectively, "State Defendants"). (Doc. No. 42.) Defendant Summer Stephan joins in the motion to dismiss and in the reply brief in support of motion to dismiss. (Doc. Nos. 43, 46.) The motion is fully briefed, (Doc. Nos. 44, 45), and the matter is suitable for determination on the papers. For the reasons stated herein, the Court **GRANTS** the motion to dismiss Plaintiffs' Complaint.

///

///

///

1

## I.    BACKGROUND[1]

Plaintiff B&L Productions, Inc., d/b/a Crossroads of the West, operates gun show events in California, including at the Del Mar Fairgrounds (the "Fairgrounds"). (First Amended Complaint ("FAC"), Doc. No. 36, ¶ 1.) Plaintiffs California Rifle & Pistol Association, Inc.; South Bay Rod and Gun Club, Inc.; Second Amendment Foundation, Inc.; Barry Bardack; Ronald J. Diaz, Sr.; John Dupree; Christopher Irick; Lawrence Michael Walsh; Robert Solis; Captain Jon's Lockers, LLC; and L.A.X. Firing Range, d/b/a LAX Ammo (collectively, "Plaintiffs"), attend and participate in the Crossroads gun show at the Fairgrounds. (*Id.* ¶ 3.) Individuals attending and participating in these gun shows engage in First Amendment activities, (*id.* ¶ 3), and exchange information about gun-related activities (*id.* ¶ 4).

The Fairgrounds is owned by the State of California and managed by the board of directors of Defendant 22nd District Agricultural Association (the "District"). (*Id.* ¶ 27.) The Fairgrounds "is used by many different public groups and is a major event venue for large gatherings of people to engage in expressive activities, including concerts, festivals, and industry shows." (*Id.* ¶ 85.)

Defendant Gavin Newsom is the Governor of the State of California and is "vested with 'the supreme executive power' of the state and 'shall see that the law is faithfully executed.'" (*Id.* ¶ 24 (citing Cal. Const. art. 5, § 1).) According to the FAC, Newsom urged the District to ban gun shows at the Fairgrounds in a letter dated April 23, 2018, citing his concern that "[p]ermitting the sale of firearms and ammunition on state-owned property only perpetuates America's gun culture." (*Id.* ¶ 106.) Thereafter, Newsom signed Assembly Bill 893 ("AB 893") into law on October 11, 2019. (*Id.* ¶ 140.)

Defendant Karen Ross is the Secretary of the California Department of Food & Agriculture, the entity responsible for policy oversight of the Fairgrounds. (*Id.* ¶ 28.)

---

[1] The following allegations are taken from the Plaintiffs' Complaint and are construed as true for the limited purpose of ruling on this motion. *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247 (9th Cir. 2013).

According to the FAC, she oversees the operation of the District and authorizes the other Defendants to "issue policy recommendations for district boards, including recommendations about bans on gun show events at state-owned fairground." (*Id.*)

Defendant Robert Bonta is the Attorney General of the State of California and "has the duty to 'see that the laws of the State are uniformly and adequately enforced.'" (*Id.* ¶ 25 (citing Cal. Const. art. 5, § 1).) Bonta has "direct supervision over every district attorney" within California and "shall assist any district attorney in the discharge" of duties when "required by the public interest or directed by the Governor . . . ." (*Id.*)

County Defendant Summer Stephan is "responsible for enforcing the law within the County of San Diego." (*Id.* ¶ 26.) According to the FAC, Stephan is "charged with prosecuting any violation of the California Food & Agricultural Code, including section 4158 (i.e., AB 893) within the county of San Diego." (*Id.*)

AB 893, which added Section 4158 to the California Food & Agriculture Code, bars "any officer, employee, operator, lessee, or licensee of the [District]" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds . . . ." (*Id.* ¶ 120.) Violation of the law is a misdemeanor. (*Id.*)

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the pleadings and allows a court to dismiss a complaint upon a finding that the plaintiff has failed to state a claim upon which relief may be granted. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The court may dismiss a complaint as a matter of law for: "(1) lack of cognizable legal theory or (2) insufficient facts under a cognizable legal claim." *SmileCare Dental Grp. v. Delta Dental Plan of Cal.*, 88 F.3d 780, 783 (9th Cir. 1996) (citation omitted). However, a complaint survives a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Notwithstanding this deference, the reviewing court need not accept legal

3

conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It is also improper for the court to assume "the [plaintiff] can prove facts that [he or she] has not alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). On the other hand, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. The court only reviews the contents of the complaint, accepting all factual allegations as true, and drawing all reasonable inferences in favor of the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

## III. REQUEST FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 states a court may "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

State Defendants request judicial notice of multiple exhibits which include letters from the California Department of General Services' Government Claims Program. (Doc. No. 42-2 at 1–3.) Because the Court does not rely on these documents in deciding this motion, Defendants' request for judicial notice is **DENIED AS MOOT**.

## IV. DISCUSSION

### A. Individual Capacity Claims as to Governor Newsom, Attorney General Bonta, and Secretary Ross

State officials can be sued when acting in their individual capacities. *Hafer v. Melo*, 502 U.S. 21, 23 (1991). The distinction is "more than a mere pleading device." *Id.* at 27 (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 72 (1989)). State officials are liable for "acts" taken under color of state law, but the Eleventh Amendment "prohibits damage actions against the 'official's office'—actions that are in reality suits against the state itself, rather than its individual officials." *Stivers v. Pierce*, 71 F.3d 732, 749 (9th Cir. 1995).

///

4

Plaintiffs sue Newsom, Bonta, and Ross in their individual capacities and allege State Defendants (1) engaged in intentional and negligent interference with Plaintiffs' prospective economic advantage, and (2) engaged in intentional interference with Plaintiffs' ability to contract. (FAC ¶¶ 253–80.) However, Plaintiffs have again failed to allege facts that relate to individual capacity—that is, Plaintiffs treat individual capacity as a "mere pleading device." Plaintiffs allege the acts of State Defendants disrupted Plaintiffs' economic relationships but do not provide facts to show how these acts were committed outside of Defendants' official capacities. The heart of Plaintiffs' claims is the passage of AB 893—an act done only in State Defendants' official capacities pursuant to state law. As such, the Court **DISMISSES** Plaintiffs' claims for damages against Newsom, Bonta, and Ross in their individual capacities **WITHOUT LEAVE TO AMEND**.

## B. First Amendment Claims

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018). Under the First Amendment, "a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). "Content-based regulations 'target speech based on its communicative content.'" *Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2371 (quoting *Reed*, 576 U.S. at 163).

Plaintiffs contend AB 893 violates the First Amendment as an impermissible content-based restriction of speech and is an effort to indirectly ban gun shows altogether. (FAC ¶¶ 188, 192.) Additionally, Plaintiffs assert AB 893 is a restriction of commercial speech. (*Id.* ¶ 205.)

5

Defendants contend AB 893 does not violate the First Amendment because its "plain language and legislative findings show that it prohibits only non-speech conduct—the sale of firearms and ammunition." (Doc. No. 42 at 8.) Defendants also highlight that AB 893 does not prohibit "offers for sale." (*Id.*) Rather, they claim AB 893 merely prohibits the sale of guns, and the sale of guns is not "speech" within the meaning of the First Amendment. (*Id.*) The Court agrees.

As held by the Ninth Circuit, "the act of exchanging money for a gun is not 'speech' within the meaning of the First Amendment." *Nordyke v. Santa Clara Cnty.* ("*Nordyke 1997*"), 110 F.3d 707, 710 (9th Cir. 1997). Here, AB 893 covers no more than the simple exchange of money for a gun or ammunition, solely prohibiting "the sale of firearms and ammunition at the Del Mar Fairgrounds . . . ." (FAC ¶ 154.) In their FAC, Plaintiffs continue to fail to cite any authority for their proposition that barring sales infringes speech. *See Nordyke v. King* ("*Nordyke 2003*"), 319 F.3d 1185, 1191 (9th Cir. 2003). Rather, Plaintiffs merely assert, once again, that banning the commercial sale of firearms and ammunition at the Fairgrounds "intentionally and effectively" bans gun shows altogether and "sweeps up all forms of speech and expressive conduct" at a public venue. (FAC ¶¶ 191–92.) Plaintiffs fail to point the Court to any facts that show how AB 893 "intentionally and effectively" leads to the banning of gun shows altogether. "[M]ere conclusory statements[] do not suffice" for a pleading. *Ashcroft*, 556 U.S. at 678.

Regarding Plaintiffs' claim that AB 893 restricts commercial speech, "[the sale of guns] itself is not commercial speech and a ban on [sales] at most interferes with sales that are not commercial speech, . . . the [Defendants'] prohibition on [the sale of guns] does not infringe [Plaintiffs'] right to free commercial speech." *Nordyke 2003*, 319 F.3d at 1191. Moreover, AB 893 does not prohibit *offers* for sale. *See Nordyke 1997*, 110 F.3d at 710 (the act of exchanging money is not "speech" within the meaning of the First Amendment while an offer to sell firearms is speech). At most, AB 893 restricts the exchanging of money for guns or ammunition. It is well established that the exchanging of money "for a gun is not 'speech' within the meaning of the First Amendment." *Id.*

6

As such, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' First Amendment claims **WITHOUT LEAVE TO AMEND**.

### C.    Second Amendment Claim

Plaintiffs, for the first time, raise a Second Amendment claim in their FAC. Let it be clear that when this Court grants a motion to dismiss with leave to amend, Plaintiffs are strictly limited to curing deficiencies where leave is granted. (*See* Doc. No. 35 at 16.) Leave to amend was granted for the following: (1) individual capacity claims as to Governor Newsom, Attorney General Bonta, and Secretary Ross; (2) the First Amendment claims; (3) the Equal Protection claim; and (4) the state law claims. (*Id.* at 11–15.) Plaintiffs violated Federal Rule of Civil Procedure 15 in asserting a new, independent claim in their FAC. Nevertheless, the Court will consider the Second Amendment claim in the spirit of judicial economy. However, Plaintiffs are put on notice that any future procedural violations may result in disciplinary sanctions.

Turning to the merits, Plaintiffs assert Defendants "cannot satisfy their burden to justify their ban on the sale of firearms and ammunition at the Fairgrounds under the history-and-tradition-based test applied in *Heller* and recently confirmed in *Bruen*." (FAC ¶ 57.) Specifically, Plaintiffs argue Defendants "cannot cite a relevant historical law forbidding commercial speech relating to firearms sales" and rely on questionable authority. (Doc. No. 44 at 19.)

The *Bruen* Court set forth a test which requires courts to assess whether "modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022). The present standard as pronounced in *Bruen* is, as follows: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30. While the Court did not provide an "exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," there are at least "two

7

metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. Applying that analysis here, the Court must first determine whether the limited prohibition of the sale of firearms and ammunition at a gun show is covered by the plain text of the Second Amendment. Assuming it is, *Bruen* demands there must be a historical analogue—a tradition of similar firearm regulation—that supports the practice.

The Court in *Bruen* acknowledged the legitimacy of gun regulations as recognized in *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008) and in *McDonald v. Chicago*, 561 U.S. 742, 786 (2010). In his majority opinion in *Bruen*, Justice Thomas confirmed the Constitution permits state licensing regimes to require gun licensing and background checks as long as the requirements do not have the effect of preventing law-abiding citizens from exercising their Second Amendment rights. *Bruen*, 142 S. Ct. at 2138 n.9. In his concurring opinion, Justice Kavanaugh, joined by the Chief Justice, affirmed that, under *Heller*, "the Second Amendment allows a 'variety' of gun regulations," including such "presumptively lawful regulatory measures" as "requir[ing] a [gun] license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162. Thus, so long as the regulation of the right to keep and bear arms does not amount to a prohibition of that right, it is read that the regulation is permissible.

"As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *see Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) ("[T]he right to keep and bear arms for self-defense under the Second Amendment . . . must also include the right to acquire a firearm, although that acquisition right is far from absolute . . . ."). However, in *Heller*, the Supreme Court included "laws imposing

conditions and qualifications on the commercial sale of arms" in a list of "presumptively lawful regulatory measures" consistent with the Second Amendment. 554 U.S. at 626–27; *see Teixeira*, 873 F.3d at 683 ("Nothing in the text of the Amendment, as interpreted authoritatively in *Heller*, suggests the Second Amendment confers an independent right to sell or trade weapons."). The Court does not find this holding to be overruled by *Bruen*.

Here, Plaintiffs correctly reference the history and tradition test confirmed in *Bruen* but do not provide the necessary allegations to support a Second Amendment claim under this new framework. Rather, Plaintiffs make the conclusory statement they "have a right, under the Second Amendment, to buy and sell firearms and the ammunition necessary for the effective operation of those firearms." (FAC ¶ 240.) To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege in the complaint "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiffs have failed to state a claim that AB 893 impedes Plaintiffs from acquiring or purchasing firearms or ammunition altogether, amounting to a prohibition of that right. Indeed, Defendants correctly state that Plaintiffs "have not plausibly alleged that AB 893 impedes them from purchasing a firearm or ammunition at a place other than a gun show at the Fairgrounds." (Doc. No. 42-1 at 25.)

As such, Plaintiffs' Second Amendment claim is **DISMISSED WITH LEAVE TO AMEND**.

### D. Equal Protection Claim

Plaintiffs further raise equal protection claims on the theory that Defendants treat them differently than similarly situated persons. Plaintiffs contend that Defendants' "refusal to allow Plaintiffs equal use of the [Fairgrounds] . . . violates Plaintiffs' right to equal protection . . . because it is based on a 'bare desire to harm a politically unpopular group.'" (FAC ¶ 251.) Plaintiffs assert their equal protection claim is based on the State's "viewpoint-discriminatory and animus-based restriction of Plaintiffs' protected speech that serves no compelling governmental interest." (*Id.* ¶ 248.) Thus, Plaintiffs equal protection claim is predicated on their First Amendment claims.

///

A piece of legislation is presumed valid under the Equal Protection Clause "if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). "[A] court may strike down [a] statute under the Equal Protection Clause if the statute serves no legitimate governmental purpose and if impermissible animus toward an unpopular group prompted the statute's enactment." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1200 (9th Cir. 2018) (citing *Mtn. Water Co. v. Mont. Dep't of Pub. Serv. Regul.*, 919 F.2d 593, 598 (9th Cir. 1990)).

Plaintiffs fail to allege any facts showing that impermissible animus and viewpoint discrimination prompted the enactment of AB 893. Rather, Plaintiffs again make a conclusory statement that AB 893 is "based on a 'bare desire to harm a politically unpopular group.'" Absent facts to show Defendants' impermissible animus, the Court will not accept any of Plaintiffs' conclusory statements.

Plaintiffs' equal protection claims also fall with the First Amendment claims. *OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012). Plaintiffs do not allege membership in a protected class or contend that Defendants' conduct burdened any fundamental right other than their right to free speech. Therefore, Defendants' differential treatment of Plaintiffs draws strict scrutiny (as opposed to rational basis review) under the Equal Protection Clause only if it impinges Plaintiffs' First Amendment rights. *See ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 797–98 (9th Cir. 2006); *Monterey Cnty. Democratic Cent. Comm. v. U.S. Postal Serv.*, 812 F.2d 1194, 1200 (9th Cir. 1987) (noting with regard to "equal protection claims relating to expressive conduct," that "[o]nly when rights of access associated with a public forum are improperly limited may we conclude that a fundamental right is impinged").

As explained above, the FAC fails to allege that Defendants infringed Plaintiffs' right to free speech by the passage of AB 893. Therefore, the Complaint also fails to state equal protection claims for differential treatment that is entrenched upon a fundamental right. *See OSU Student All.*, 699 F.3d at 1067. Thus, the Court **GRANTS** Defendants'

21-cv-01718-AJB-DDL

motion to dismiss Plaintiffs' sixth claim under the Fourteenth Amendment's Equal Protection Clause **WITHOUT LEAVE TO AMEND**.

## D. The Court Lacks Jurisdiction Over the State Law Claims Against Defendants Newsom, Bonta, Ross, and the District

"The district courts of the United States . . . are 'courts of limited jurisdiction. They possess only that power authorized by Constitution and statute.'" *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). "In order to provide a federal forum for plaintiffs who seek to vindicate federal rights, Congress has conferred on the district courts original jurisdiction in federal-question cases—civil actions that arise under the Constitution, laws, or treaties of the United States." *Id.* "Although the district courts may not exercise jurisdiction absent a statutory basis, it is well established—in certain classes of cases—that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." *Id.* Such jurisdiction arises under 28 U.S.C. § 1367(a).

The Supreme Court has characterized § 1367(a) as providing district courts "a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction." *Exxon Mobil Corp.*, 545 U.S. at 558. The Ninth Circuit has explained that the term "'[o]riginal jurisdiction' in subsection (a) refers to jurisdiction established by looking for any claim in the complaint over which there is subject matter jurisdiction." *Gibson v. Chrysler Corp.*, 261 F.3d 927, 940 (9th Cir. 2001), *holding modified by Exxon Mobil Corp.*, 545 U.S. 546.

Plaintiffs assert this Court has supplemental jurisdiction over their state law claims "because those claims share common operative facts with Plaintiffs' federal law claims." (FAC ¶ 10.) As detailed above, the Court dismisses all federal law claims against both State and County Defendants. The remaining claims against Defendants rest on only California state law. (*Id.* ¶¶ 253–61 (intentional interference with prospective economic advantage); ¶¶ 262–71 (negligent interference with prospective economic advantage); ¶¶ 272–80

11

(intentional interference with contract).) Plaintiffs also lack diversity jurisdiction because Plaintiffs and State Defendants and County Defendants are all California residents. (*Id.* ¶¶ 24–28.) Thus, the Court lacks any basis to assert subject matter jurisdiction over Plaintiffs' action as it pertains to all Defendants. Absent such basis, the Court may not exercise supplemental jurisdiction over the state law claims against all Defendants. *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 664 (9th Cir. 2002). Accordingly, the Court **DISMISSES** all remaining state law claims against all Defendants **WITH LEAVE TO AMEND**. *Wade v. Reg'l Credit Ass'n*, 87 F.3d 1098, 1101 (9th Cir. 1996) ("Where a district court dismisses a federal claim, leaving only state claims for resolution, it should decline jurisdiction over the state claims and dismiss them without prejudice.").

## V.    CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' motion to dismiss. (Doc. No. 42.) Should Plaintiffs choose to do so, where leave is granted, they must file an amended complaint curing the deficiencies noted herein <u>no later than March 24, 2023</u>. Defendants must file a responsive pleading <u>no later than April 7, 2023.</u>


        **IT IS SO ORDERED.**

Dated:  March 13, 2023

Hon. Anthony J. Battaglia
United States District Judge

O

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST; GERALD CLARK; ERIC JOHNSON; CHAD LITTRELL; JAN STEVEN MERSON; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED; ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION; SECOND AMENDMENT LAW CENTER, INC.; and SECOND AMENDMENT FOUNDATION, | Case No. 8:22-cv-01518-JWH-JDE **ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [ECF No. 21]** |

　　　　　Plaintiffs,

　　v.

GAVIN NEWSOM, in his official capacity as Governor of the State of California;
ROB BONTA, in his official capacity as Attorney General of the State of California;
KAREN ROSS, in her official capacity as Secretary of California Department of Food & Agriculture and in her personal capacity;
TODD SPITZER, in his official capacity as District Attorney of Orange County;
32nd DISTRICT AGRICULTURAL ASSOCIATION; and
DOES 1-10,

　　　　　Defendants.

# I. SUMMARY OF DECISION

The California legislature recently enacted two statutes that effectively ban gun shows at the Orange County Fairgrounds and, more broadly, on state-owned property. Plaintiffs, a group of gun show proprietors and enthusiasts, sued the Governor of California and other state officials and agencies in an effort to invalidate those two state statutes.

Plaintiffs moved for a preliminary injunction. Plaintiffs argue that the statutes at issue infringe both their First Amendment freedom-of-speech rights in a public forum and their Second Amendment rights to keep and bear arms. After reviewing the parties' extensive briefing and conducting a hearing on the motion, the Court concludes that Plaintiffs have established that they are likely to succeed on the merits of their constitutional claims and that they have satisfied the other requirements for injunctive relief. Accordingly, Plaintiffs' motion is **GRANTED**. Defendants are preliminarily **ENJOINED** and **RESTRAINED** from enforcing the two state statues at issue.

# II. BACKGROUND

Before the Court is the motion of Plaintiffs B&L Productions, Inc.; Gerald Clark; Eric Johnson; Chad Littrell; Jan Steven Merson; California Rifle & Pistol Association, Incorporated; Asian Pacific American Gun Owners Association; Second Amendment Law Center, Inc.; and Second Amendment Foundation for a preliminary injunction against Defendants Gavin Newsom, in his official capacity as Governor of the State of California; Rob Bonta, in his official capacity as Attorney General of the State of California; Karen Ross, in her official capacity as Secretary of California Department of Food & Agriculture and in her personal capacity; Todd Spitzer, in his official capacity as District Attorney of Orange County; and 32nd District Agricultural Association.[1] Specifically, Plaintiffs seek to enjoin Defendants from enforcing two statutes—California Penal Code §§ 27573 and 27575—during the pendency of this action.

The Court conducted a hearing on the Motion in April 2023. After considering the many papers filed in support and in opposition,[2] as well as the argument of counsel at

---

[1] Pls.' Mot. for Prelim. Inj. (the "Motion") [ECF No. 21].

[2] The Court considered the documents of record in this action, including the following papers: (1) First Am. Compl. (the "Amended Complaint") (including its attachments) [ECF No. 19]; (2) Motion (including its attachments); (3) Defs.' Opp'n to the Motion (the "Opposition") [ECF No. 22]; (4) Pls.' Reply in Supp. of the Motion (the "Reply") [ECF No. 23]; (5) State Defs.' Suppl. Brief in Opp'n to the Motion ("Defendants' Supplemental

the hearing, the Court orders that the Motion is **GRANTED**, for the reasons set forth below.

## A. Facts

Plaintiff B&L Productions, Inc., operating as Crossroads of the West ("Crossroads"), has hosted gun shows at the Orange County Fair & Event Center (the "Orange County Fairgrounds") every year for the past 30 years.[3] During that period, Crossroads was the largest vendor of gun show events in California and at the Orange County Fairgrounds.[4] Crossroads claims that it "operated popular, safe, heavily regulated, legal, and family-friendly gun shows" at the Orange County Fairgrounds, "where like-minded individuals gather to engage in commerce related to, and necessary for, the lawful and regulated exercise of Second Amendment rights."[5] Although the sales of firearms were a major factor driving the popularity and profitability of the gun shows, participants also exchanged information regarding hunting, target practice, firearm training and safety, gunsmithing, and political advocacy.[6] While fewer than 40% of the vendors at Crossroads' gun shows offer firearms or ammunition for sale, the principal draw of gun shows is the sale of firearms and ammunition, as well as the demonstration of firearms by knowledgeable dealers.

### 1. Firearm Regulations at Gun Shows

Plaintiffs contend that "California has the most rigorous regulatory regime for commerce in firearms and ammunition in the United States" and that those regulations apply to all gun shows throughout California.[7] Only state-approved, licensed gun show producers may operate gun shows in California; a "producer" is defined as one who holds a Certificate of Eligibility issued by the California Department of Justice.[8] Gun

---

Brief") [ECF No. 26]; (6) Pls.' Suppl. Brief in Supp. of the Motion [ECF No. 27]; (7) State Defs.' Second Suppl. Brief in Opp'n to the Motion ("Defendants' Second Supplemental Brief") [ECF No. 31]; (8) Pls.' Response to Defendants' Second Supplemental Brief [ECF No. 32]; (9) Pls.' Obj. to State Defs.' Expert Decl. ("Plaintiffs' Evidentiary Objections") [ECF No. 33]; (10) State Defs.' Reply in Supp. of Suppl. Brief in Opp'n to the Motion ("Defendants' Supplemental Reply") [ECF No. 34]; (11) State Defs.' Response to Plaintiffs' Evidentiary Objections [ECF No. 35]; (12) Pls.' Notice of Suppl. Authority [ECF No. 36]; and (13) Pls.' [Second] Notice of Suppl. Authority [ECF No. 42].

[3]    Amended Complaint ¶ 11.

[4]    *Id.*

[5]    *Id.* at ¶¶ 1 & 2.

[6]    *Id.* at ¶ 4.

[7]    *Id.* at ¶ 43.

[8]    *Id.* at ¶¶ 44 & 45.

show producers must certify that they are familiar with all California laws and regulations regarding gun shows; they must possess a minimum of $1,000,000 in liability insurance; they must provide an annual list of such shows or events to the California Department of Justice; and they must provide law enforcement with a list of all vendors that will participate in the gun show to sell, lease, or transfer firearms. Cal. Penal Code § 27200 & 27205.[9] Vendors must also provide an annual event and security plan to the California Department of Justice and to local law enforcement agencies.[10]

All gun show vendors must comply with all California state laws, and gun show producers must post signage stating that participants must comply with state law and that each firearm carried onto the premises will be checked, cleared, and secured before its owner is admitted to the gun show.[11] Additionally, those signs must state that "[a]ll firearm transfers between private parties at the show shall be conducted through a licensed dealer in accordance with applicable state and federal laws."[12] Gun show producers must also post signs stating that "[t]he transfer of firearms on the parking lot of this facility is a crime."[13]

Furthermore, except in limited circumstances that are unique to law enforcement, actual firearm transfers are prohibited from taking place at any gun show in California.[14] Firearm sales may be *initiated* through an on-site licensed "transfer dealer," but delivery of the firearm cannot be *completed* at the gun show. Instead, purchasers must pick up their purchased firearm at a licensed retailer at a different location, following a 10-day waiting period and successful background check. Plaintiffs claim that, as a result, there is "no gun show loophole" at gun shows in California, which must operate in accordance with state law.[15] Gun shows must also follow California's Gun Show Act of 2000, Cal. Penal Code §§ 27200-27245, which places many additional regulations on gun shows in California.[16]

---

[9]     *Id.* at ¶ 46.

[10]    *Id.* at ¶ 47.

[11]    *Id.* at ¶¶ 49 & 52.

[12]    *Id.* at ¶ 52.

[13]    *Id.* at ¶ 53.

[14]    *Id.* at ¶ 55.

[15]    *Id.*

[16]    *Id.* at ¶ 56.

## 2.  SB 264

California State Senator Dave Min, acting upon his campaign promise that "in my first 100 days in office, I promise to author legislation for a ban on these gun shows at the OC Fair and Events Center once and for all," sponsored Senate Bill 264 ("SB 264").[17] The bill, which took effect on January 1, 2022, modified Cal. Penal Code § 27575,[18] and it bars any "officer, employee, operator, lessee, or licensee of the [District]" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm, firearm precursor part, or ammunition on the property or in the building that promise the OC Fair and Events Center."[19]  SB 264 does not bar the possession of firearms at the Orange County Fairgrounds, and it contains exceptions for law enforcement and gun buyback programs.[20]

In his comments on March 16, 2021, to the Senate Public Safety Committee, Senator Min stated that "SB 264 will ensure that the state is not profiting from the sale of firearms and ammunition on state property or facilitating gun shows that would undermine California's strong firearm regulations."[21]  He went on to explain that even if no unlawful activities occurred at gun shows, "there is a principal [*sic*] that taxpayers

---

[17]    *Id.* at ¶ 131.

[18]    The entire text of Cal. Penal Code § 27575 is as follows:

(a)    Notwithstanding any other law, an officer, employee, operator, lessee, or licensee of the 32nd District Agricultural Association, as defined in Section 3884 of the Food and Agricultural Code, shall not contract for, authorize, or allow the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the OC Fair and Event Center, in the County of Orange, the City of Costa Mesa, or any successor or additional property owned, leased, or otherwise occupied or operated by the district.

(b)    This section does not apply to any of the following:

(1)    A gun buyback event held by a law enforcement agency.

(2)    The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties.

(3)    The sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2022.

(4)    The purchase of ammunition on state property by a law enforcement agency in the course of its regular duties.

[19]    Amended Complaint ¶ 133.

[20]    *Id.* at ¶ 134.

[21]    *Id.* at ¶ 141.

should not be utilized, and taxpayer venues should not be utilized to promulgate the distribution of more guns into our communities."[22]

### 3.    SB 915

Building upon SB 264's ban on sales of firearms at the Orange County Fairgrounds, Senator Min next introduced SB 915 added Cal. Penal Code § 27573[23] barring any "state officer or employee, or operator, lessee, or licensee of any state property" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm, firearm precursor part, or ammunition on state property or in the buildings that sit on state property or property otherwise owned, leased, occupied, or operated by the state."[24]

Although SB 915 did not take effect until January 1, 2023, Plaintiffs claim that, even before that date, state officials had stopped entering into contracts with gun show promoters.[25] Senator Min issued a press release declaring that "[l]ast year we laid the foundation for this moment with a ban on gun shows at the Orange County Fairgrounds. Today, I am proud to announce that California will become the first in the nation to enact a total ban statewide."[26]

---

[22]    *Id.* at ¶ 142.

[23]    The entire text of Cal. Penal Code § 27573 is as follows:

(a)    A state officer or employee, or operator, lessee, or licensee of any state property, shall not contract for, authorize, or allow the sale of any firearm, firearm precursor part, or ammunition on state property or in the buildings that sit on state property or property otherwise owned, leased, occupied, or operated by the state.

(b)    This section does not apply to any of the following:

(1)    A gun buyback event held by a law enforcement agency.

(2)    The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties.

(3)    The sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2023.

(4)    The purchase of firearms, firearm precursor parts, or ammunition on state property by a law enforcement agency in the course of its regular duties.

(5)    The sale or purchase of a firearm pursuant to subdivision (b) or (c) of Section 10334 of the Public Contract Code.

[24]    Amended Complaint ¶ 146.

[25]    *Id.* at ¶ 148.

[26]    *Id.* at ¶ 149.

Crossroads was unable to contract for a gun show for 2021. Instead, Defendant 32nd District Agricultural Association (the "32nd DAA") informed Plaintiffs that it would revisit the issue again in January 2022, after SB 264 went into effect.[27] Since the passage of SB 264, Plaintiffs have been unable to use the Orange County Fairgrounds as a venue for gun shows, even though Crossroads claims that it offered to hold events without the sale of firearms, ammunition, or precursor parts.[28] SB 915 has similarly prevented Plaintiffs from holding gun shows at any other state-owned facilities in California.[29]

## B. Procedural History

Plaintiffs filed their initial Complaint in August 2022 and amended their pleading November 2022, asserting the following seven claims for relief:

- Violation of Right to Free Speech Under U.S. Const., amend. I, 42 U.S.C. § 1983;
- Violation of Right to Free Speech Under U.S. Const., amend. I, Mixed Political—Commercial, 42 U.S.C. § 1983;
- Violation of Right to Commercial Speech Under U.S. Const., amend. I, 42 U.S.C. § 1983;
- Prior Restraint on Right of Free Speech Under U.S. Const., amend. I, 42 U.S.C. § 1983;
- Violation of Right to Assembly and Association Under U.S. Const., amend. I, 42 U.S.C. § 1983;
- Violation of the Right to Equal Protection Under U.S. Const., amend. XIV, 42 U.S.C. § 1983;
- Violation of Right to Keep and Bear Arms Under U.S. Const., amend. II, 42 U.S.C. § 1983.[30]

That same month, Plaintiffs filed the instant Motion for a preliminary injunction. After reviewing the parties' initial papers, the Court ordered two rounds of supplemental briefing concerning Plaintiffs' Second Amendment claim.[31]

---

[27]    *Id.* at ¶ 162.

[28]    *Id.* at ¶¶ 165 & 166.

[29]    *Id.* at ¶ 166.

[30]    *See id.*

[31]    *See* Order for Suppl. Briefing Regarding the Motion [ECF No. 25]; Order for Add'l Suppl. Briefing Regarding the Motion [ECF No. 28].

## III. LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy. . .; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). An injunction is binding only on parties to the action, their officers, agents, servants, employees, and attorneys and those "in active concert or participation" with them. Fed. R. Civ. P. 65(d)(2).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotations omitted).

## IV. ANALYSIS

### A. Request for Judicial Notice

Plaintiffs and Defendants submit separate requests for judicial notice with their respective papers. Plaintiffs request judicial notice of 25 public documents, consisting of legislative history pertaining to the two state bills, as well as both federal and state government studies concerning gun violence.[32] Defendants request judicial notice of four publicly filed documents relating to a case styled as *B&L Prods. v. Newsom*, Case No. 21-cv-1718, which is pending in the Southern District of California.[33]

Rule 201 of the Federal Rules of Evidence permits judicial notice of facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Such facts include "matters of public record." *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). Additionally, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be

---

[32] *See* Pls.' Request for Judicial Notice in Supp. of the Motion ("Plaintiffs' RJN") [ECF No. 21-2].

[33] *See* State Defs.' Request for Judicial Notice in Supp. of Opp'n to the Motion [ECF No. 22-2].

questioned." Fed. R. Evid. 201(b)(c). In the Ninth Circuit, "court filings and other matters of public record" are sources whose accuracy cannot reasonably be questioned for the purposes of Rule 201. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). "The court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Accordingly, to the extent that the Court relies upon the documents provided by Plaintiffs and Defendants, both parties' requests for judicial notice are **GRANTED**.[34]

**B.    Preliminary Injunction Factors**

**1.    Likelihood of Success on the Merits**

**a.    Plaintiffs' First Amendment Claims**

Plaintiffs move for a preliminary injunction based upon several theories under the First Amendment. First, Plaintiffs assert that California's ban on the sale of firearms at state-owned fairgrounds is "a thinly veiled" pretextual attack on the gun shows themselves and that the laws are an unconstitutional censorship of content and viewpoints.[35] Second, Plaintiffs claim that the Orange County Fairgrounds is a public forum and that the state's restriction on gun sales at gun shows acts as a content-based speech prohibition.[36] Finally, Plaintiffs argue that the ban on gun sales at the Orange County Fairgrounds serves as a restriction on commercial speech and that, even with diminished First Amendment protections, the enforcement of the state statutes in question should still be enjoined.

"In recognition of the longstanding principle that courts should avoid 'passing on questions of constitutionality . . . unless such adjudication is unavoidable,'" *City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1089 (9th Cir. 2022) (citing *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944)), the Court will begin by addressing Plaintiffs' First Amendment claims on the narrower commercial speech restriction. *See also Ashwander v. TVA*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring) (counseling that a court should neither "anticipate a question of constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied").

---

[34]    Plaintiffs object to Defendants' expert declarations in their Second Supplemental Brief. *See* Plaintiffs' Evidentiary Objections. Because those expert declarations are relevant to the supplemental briefing that the Court requested, Plaintiffs' objections are **OVERRULED**, and Plaintiffs' accompanying motion to strike is **DENIED**.

[35]    Motion 7:5-10.

[36]    *Id.* at 10:25-11:10.

### i.    Commercial Speech

"The Fourteenth Amendment, by incorporating the First Amendment and applying it to the States, precludes state and local governments from 'abridging the freedom of speech.'" *Nordyke v. Santa Clara Cnty.*, 110 F.3d 707, 710 (9th Cir. 1997) ("*Nordyke 1997*").  Defendants claim that SB 264 and SB 915 do not abridge anyone's freedom of speech, because those laws "prohibit the sale of firearms, firearm precursor parts, and ammunition at the Fairgrounds and state property, respectively, and thus an offer to make such sales, assuming that it does not concern a lawful activity, is not protected commercial speech."[37]

Commercial speech is defined as speech that "does no more than propose a commercial transaction." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762 (1976) (Stewart, J., concurring); *see also Hunt v. City of Los Angeles*, 638 F.3d 703 (9th Cir. 2011) (holding that when "speech is directed to [a seller's] products and why a consumer should buy them," that speech "clearly propose[s] a commercial transaction").  Additionally, when evaluating the sale of firearms within the gun show context, the Ninth Circuit has held that "[a]n offer to sell firearms or ammunition is speech that 'does no more than propose a commercial transaction.'  Such an offer is, therefore, commercial speech within the meaning of the First Amendment." *Nordyke 1997*, 110 F.3d at 710.

First Amendment protections for commercial speech are not unlimited, however; they are governed by the test that the Supreme Court articulated in *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980):

> In commercial speech cases, then, a four-part analysis has developed.  At the outset, we must determine whether the expression is protected by the First Amendment.  For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.  Next, we ask whether the asserted governmental interest is substantial.  If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566.

The Ninth Circuit has previously analyzed commercial speech protections for gun shows.  In *Nordyke 1997*, the Ninth Circuit heard an appeal from a preliminary injunction preventing the enforcement of an addendum to the lease between the Santa Clara County

---

[37]    Opposition 16:2-6.

Fairgrounds Management Corporation (the "SCCFMC") and the owner of the Fairgrounds, Santa Clara County. The addendum to the lease prohibited any gun shows from being held on the fairgrounds. *Nordyke 1997*, 110 F.3d at 708. Similar to the instant action, there Santa Clara County informed the SCCFMC that the county did not intend to ban the "exchange of information or ideas about guns, gun safety, or the display of guns for historical or educational purposes," but it prohibited only the "selling, offering for sale, supplying, delivering, or giving possession or control of firearms or ammunition to any other person at a gun show at the fairgrounds." *Id.* at 708-09. The ban extended to "any act initiating any of the foregoing transactions with the intent of completing them at a later date." *Id.* at 709.

The Nordykes—plaintiffs/appellees in *Nordyke 1997*—were gun show promoters who had previously operated at the Santa Clara Fairgrounds. The Northern District of California granted the Nordykes' request for a preliminary injunction because the addendum to the lease violated the Nordykes' First Amendment rights. *See id.* The Ninth Circuit concluded that "the sale of firearms at a gun show at the Fairgrounds, which is not proscribed by federal or state law, is 'lawful activity,' because the County has not enacted an ordinance to prohibit such sales." *Id.* at 710. In a footnote, the Ninth Circuit explained that "we are assuming, without deciding, for the purposes of this analysis, that the County has the power to enact such an ordinance. However, we acknowledge that, under established preemption principles, the County may in fact lack that power." *Id.* at 710 n.3.

The Nordykes' legal saga continued over the next two decades, when those plaintiffs subsequently challenged an Alameda County ordinance that prohibited the possession of firearms on county property, which would make gun shows unprofitable. *See Nordyke v. King*, 319 F.3d 1185, 1188 (9th Cir. 2003) ("*Nordyke 2003*"); *see also Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012) (detailing the action's 12-year history involving Alameda County). In *Nordyke 2003*, the Ninth Circuit reaffirmed that the lease addendum in *Nordyke 1997* was "an unconstitutional infringement of commercial free speech rights" because it "prohibited offers to sell guns," and the Ninth Circuit instructed that "[in] cases such as *Nordyke* [*1997*], what renders the law unconstitutional is the interference with speech itself, not the hindering of actions (e.g., sales) that are not speech." *Nordyke 2003*, 319 F.3d at 1191. The Ninth Circuit upheld Alameda County's ban on firearm possession because "possession itself is not commercial speech," and, as such, the ordinance did "not infringe Nordyke's right to free commercial speech." *Id.*

Defendants here maintain that the instant action is distinguishable from *Nordyke 1997* because SB 264 and SB 915 statutorily ban gun sales on state fairgrounds, as opposed to the addendum in *Nordyke 1997*, which modified the county's lease. Whereas the underlying gun sales were a lawful activity in *Nordyke 1997*—and they were therefore protected as commercial speech—now the State of California has passed laws prohibiting

those sales as *unlawful*, thereby justifying the commercial speech restriction under *Central Hudson*.[38]  This circular reasoning is illogical and disingenuous, however, because a law's existence cannot be the only source of its constitutional validity.  *See Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015) ("[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it.").

In order to withstand Plaintiffs' instant challenge, the statutes at issue must stand on their own constitutional soundness.  To assess whether those statutes infringe Plaintiffs' First Amendment rights, the Court must begin by examining the text of SB 264 and SB 915.  *See Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020) ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end.").

### (a)      Textual Analysis of SB 264 and SB 915

SB 264 amended California law to provide that "an officer, employee, operator, lessee, or licensee of the" 32nd DAA "shall not contract for, authorize, or allow the ***sale*** of any firearm, firearm precursor part, or ammunition on the property" of the Orange County Fairgrounds.  Cal. Penal Code § 27575 (emphasis added).  Additionally, SB 915 amended California law so that "a state officer or employee, or operator, lessee, or licensee of any state property, shall not contract for, authorize, or allow the ***sale*** of any firearm, firearm precursor part, or ammunition on state property."  Cal. Penal Code § 27573 (emphasis added).

In both statutes, the operative term "sale" controls whether commercial speech protections apply to Plaintiffs' gun shows.  Webster's Dictionary defines "sale" as "the act of selling; *specifically*:  the transfer of ownership of and title to property from one person to another for a price."[39]  Black's Law Dictionary defines "sale" as:

> 1.      The transfer of property or title for a price.  *See* UCC § 2-106(1).
> 2.      The agreement by which such a transfer takes place.  • The four elements are (1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised.[40]

---

[38]      *Id.* at 16:2-6.

[39]      "Sale."  Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/sale.  Accessed Oct. 23, 2023.

[40]      SALE, Black's Law Dictionary (11th ed. 2019).

For a sale to occur, the participants must engage in commercial speech in which the seller informs the buyer about its product, the participants engage in a negotiation, and they set a price and other terms for the exchange. *See Hunt*, 638 F.3d at 716. Because "[c]ommercial speech is 'usually defined as speech that does not more than propose a commercial transaction,'" legislation that restricts sales also restricts commercial speech. *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107 (9th Cir. 2021) (citing *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)). Although Defendants are correct that the mere "act of exchanging money for a gun is not 'speech' within the meaning of the First Amendment," *Nordyke 1997*, 110 F.3d at 710, the challenged statutes implicate commercial speech by restricting the sale of otherwise legal firearms at the Orange County Fairgrounds.[41] More specifically, at the hearing Defendants stated that SB 264 and SB 915 prevent the "consummation" of sales at gun shows and that offers and acceptances of firearm sales at gun shows were prohibited under the statues—all of which directly implicate commercial speech.[42]

Even assuming that merely exchanging money for a firearm is not speech, the sales regulated by those statutes do not involve the physical exchange of a weapon. Before the enactment of SB 264 and SB 915, customers at gun shows in California could negotiate and contract for a sale with firearm vendors, but those customers were still required to comply with California's 10-day waiting period and to retrieve the purchased firearm at a physical store not located on the fairgrounds.[43] *See* Cal. Penal Code § 26805. Because sales made at California gun shows must be completed both temporally and physically removed from the show itself, SB 264 and SB 915 exceed the mere prohibition of "exchanging money for a gun." Instead, the Court concludes that the challenged statutes unmistakably regulate commercial speech.

Further, the statutes in question do not merely regulate the sale of firearms; they also prohibit state officers, employees, operators, lessees, or licensees from "contract[ing], authoriz[ing], or allow[ing]" the sale of firearms at the Orange County Fairgrounds or on state property. Webster's Dictionary defines "contract" as "a binding agreement between two or more persons or parties; *especially*: one legally enforceable";[44] "authorize" is defined as "to endorse, empower, justify, or permit by or as if by some recognized or proper authority (such as custom, evidence, personal right, or regulating

---

[41]     Opposition 10:18-24.

[42]     April 6, 2023, Hr'g Tr. (the "Hearing Transcript") [ECF No. 40] 6:5-6 & 9:21-10:1.

[43]     Amended Complaint ¶ 55.

[44]     "Contract." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/contract. Accessed Oct. 23, 2023.

power));[45] and "allow" is defined as "permit" or "to fail to restrain or prevent."[46] The common thread behind these three words is that they require actions beyond "the act of exchanging money for a gun," *Nordyke 1997*, 110 F.3d at 710, and implicate commercial speech when they prohibit the sale of all firearm-related goods on state property.

### (b) *Central Hudson* Test

Having concluded that SB 264 and SB 915 restrict commercial speech, the Court now applies intermediate scrutiny under the Supreme Court's test in *Central Hudson*. *See Retail Digital Network, LLC v. Prieto*, 861 F.3d 839 (9th Cir. 2017) (upholding application of intermediate scrutiny through the *Central Hudson* test). As described above, the sale of lawful firearms involves commercial speech protected by the First Amendment, thereby implicating the "lawful" portion of the *Central Hudson* test. *See Nordyke 1997*, 110 F.3d at 712 ("The 'lawful' portion of the *Central Hudson* test presents no difficulty in this case."). Here, much like in *Nordyke 1997*, the Court will not address whether it is within the power of the state to restrict the sale of certain classes or types of weapons at gun shows. Assuming that the weapons that Plaintiffs sell conform with state and federal law, the sale of those weapons constitutes a lawful activity for the purposes of commercial speech. *See id.* at 710 n.3.

Next, the Court concludes that Defendants' "asserted governmental interest is substantial." *Central Hudson*, 447 U.S. at 566. In their Opposition, Defendants argue that "there is a 'substantial interest in protecting the people from those who acquire guns ***illegally*** and use them to commit crimes resulting in injury or death of their victims.'"[47] Although Defendants acknowledge that the state interest pertains only to ***illegally*** acquired firearms, California firearm regulations aimed at addressing illegal sales apply equally to gun shows and to brick-and-mortar stores.[48] *See* Cal. Penal Code § 26805. Under *Central Hudson*, then, the question before the Court is whether SB 264 and SB 915 address the state's interest in prohibiting illegal firearm sales.

Because SB 264 and SB 915 prohibit all sales of otherwise lawful firearms at the Orange County Fairgrounds and at other gun shows held on state-owned property, the statutes do not "directly advance[] the governmental interest asserted." *Central Hudson*, 447 U.S. at 556. "By banning gun sales only at the Fairgrounds," California "achieves

---

[45]     "Authorize." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/authorize. Accessed Oct. 23, 2023.

[46]     "Allow." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/allow. Accessed Oct. 23, 2023.

[47]     Opposition 16:9-11 (citing *Nordyke 1997*, 110 F.3d at 713) (emphasis added).

[48]     Amended Complaint ¶ 55.

nothing in the way of curtailing the overall possession of guns in the County," let alone *illegal* firearms. *Nordyke 1997*, 110 F.3d at 713 (citing *Nordyke v. Cnty. of Santa Clara*, 933 F. Supp. 903, 909 (N.D. Cal. 1996)).

Even if the Court were to conclude that banning lawful firearm sales at the Orange County Fairgrounds directly advances California's interest in stopping illegal weapon sales, the regulation would still be "more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 566. California's interest in stopping crimes committed with illegal weapons, "as important as it is, cannot justify" prohibiting the complete sale of lawful firearms at gun shows, *id.* at 570, especially when those same firearms are available for purchase at regular gun stores—and, in fact, the firearms purchased at gun shows must be retrieved at brick-and-mortar gun stores. *See* Cal. Penal Code § 26805.

Plaintiffs contend that Defendants enacted SB 264 and SB 915 because of a pretextual animus toward "gun culture" and those who attend gun shows,[49] but the Court does not need to infer bad faith by Defendants to issue a preliminary injunction. Although "[t]here is no doubt that the City has a substantial interest in safeguarding its citizens against violence," *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001), "even the most legitimate goal may not be advanced in a constitutionally impermissible manner," *Carey v. Brown*, 447 U.S. 455, 464–65 (1980).

A previous case in the Southern District of California is instructive. In *B&L Prods., Inc. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226 (S.D. Cal. 2019), the same Crossroads Plaintiff in the instant action commenced a case against the 22nd District Agricultural Association (the "22nd DAA") because of a one-year moratorium on gun shows at the Del Mar Fairgrounds. Although the gun show moratorium at the Del Mar Fairgrounds was broader than the prohibition on gun sales at issue here, the court held that "[a] general fear that people attending gun shows will violate state and local laws about gun possession or even commit acts of gun violence in the community upon leaving the show cannot justify the Moratorium." *Id.* at 1248.

Similar to the action involving the 22nd DAA, Defendants' attempt here to use the legislative history of SB 264 and SB 915 in support of California's asserted interest in stopping illegal firearm sales fails to survive intermediate scrutiny.[50] The legislative findings of SB 264 do not identify any specific harms at the Orange County Fairgrounds, nor do they indicate that gun shows present any particular risk that exceeds those of

---

[49]     Motion 16:9-11.

[50]     Opposition 16:12-16.

lawful gun sales accomplished at brick-and-mortar stores.[51]  Likewise, the legislative findings of SB 915 do not examine the Orange County Fairgrounds—or any other California gun shows—but, instead, they generalize the risks from other gun shows conducted across the United States, even though the legislative findings acknowledge that existing California law applies equally to all gun shows in the state.[52]  Further demonstrating the disconnect between the challenged statutes and the state's purported goals, one of the studies upon which the legislative history relies states that "in California, where both gun shows themselves and gun commerce generally are regulated, *sales at gun shows are not a risk factor* among licensed retailers for disproportionate sales of crime guns."[53]  Accordingly, under intermediate scrutiny and the *Central Hudson* test, SB 264 and SB 915 act an as unconstitutional infringement on commercial speech.  The Court therefore concludes that Plaintiffs will likely prevail on that First Amendment claim.

### ii.    Limited Public Forum

In addition to their commercial speech argument, Plaintiffs claim that Defendants have unlawfully curtailed Plaintiffs' First Amended rights by prohibiting Plaintiffs' access to a public forum.[54]

The Orange County Fairgrounds is a state-owned property maintained for public use, and it hosts all manner of expressive events, including concerts, festivals, and fairs.[55]  The 32nd DAA actively promotes public use of the property, which hosts more than 150 events that attract approximately 4.3 million visitors annually.[56]

Plaintiffs further allege that the 32nd DAA has refused to contract with Plaintiffs, even if Plaintiffs agree to exclude firearm vendors.[57]  Plaintiffs claim that they offered to host the 2022 gun show without the sale of firearms, ammunition, or precursor parts—in compliance with SB 264—but that the 32nd DAA nevertheless refused to contract with Plaintiffs.  Discovery may be necessary for Plaintiffs to establish why the 32nd DAA refused to allow Plaintiffs to use the Orange County Fairgrounds, but, in any event,

---

[51]    Amended Complaint, Ex. 11 [ECF No. 19-11] 3.

[52]    *Id.*, Ex. 16 [ECF No. 19-16] 2-4.

[53]    Decl. of Anna Barvir in Supp. of the Motion (the "Barvir Declaration") [ECF No. 21-3], Ex. 33 at 33 (emphasis added).

[54]    Motion 10:21-24.

[55]    *Id.* at 10:26-28; Barvir Declaration, Ex. 28.

[56]    Barvir Declaration, Ex. 29 at 2.

[57]    Motion 10:13-20; Decl. of Tracy Olcott in Supp. of the Motion (the "Olcott Declaration") [ECF No. 21-5] ¶¶ 7-10.

Plaintiffs' allegations exceed mere commercial speech concerns and extend to expressive conduct.

The Ninth Circuit instructs that in assessing a First Amendment claim for speech on government property, "we must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) (citing *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 797 (1985)). "[T]he two main categories of fora are public (where strict scrutiny applies) and non-public (where a more lenient 'reasonableness' standard governs)." *Id.*

Specific to the Ninth Circuit, "a limited public forum is a sub-category of a designated public forum that 'refer[s] to a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics.'" *Id.* (citing *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999)). "In a limited public forum, restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible." *Id.* (citing *Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 (1995)).

Here, the parties agree that the Orange County Fairgrounds is at least a limited public forum.[58] *See also Heffron v. Int'l Soc. For Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) (holding that "[t]he Minnesota State Fair is a limited public forum in that it exists to provide a means for a great number of exhibitors temporarily to present their products or views, be they commercial, religious, or political, to a large number of people in an efficient fashion"). In a limited public forum, any restrictions on participants "must be reasonable and viewpoint neutral." *Christian Legal Soc. v. Martinez*, 561 U.S. 661, 679 (2010).

### (a)    Reasonableness Standard

"A subject-matter or speaker-based exclusion must meet two requirements to be reasonable in a limited public forum." *Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 499 (9th Cir. 2015). "First, it must be 'reasonable in light of the purpose served by the forum.'" *Id.* (citing *Cornelius*, 473 U.S. at 806). "This requirement focuses on whether the exclusion is consistent with 'limiting [the] forum to activities compatible with the intended purpose of the property.'" *Id.* (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983)). "Second, exclusions must be based on a standard that is definite and objective. That requirement has been developed most prominently in the context of time, place, and manner restrictions in traditional public

---

[58]     Opposition 13:27-14:1; Reply 4:22-23.

forms, . . . but it applies with equal force in this context." *Id.* (internal citations omitted).

Insofar as SB 264 and SB 915 impose restrictions on commercial speech by banning the sale of firearms, those restrictions are unreasonable in the context of the Orange County Fairgrounds. Until California's legislature enacted SB 264 and SB 915, Crossroads had continually, for the past three decades, promoted gun shows at the Orange County Fairgrounds.[59] Additionally, as a limited public forum, the Orange County Fairgrounds has hosted a wide variety of vendors for other events, including auto shows, home shows, and beer and wine shows, all of which are consistent with commercial activities and similar to the events in which Plaintiffs are interested.[60] While limited public forums may restrict the type of hosted events to those "consistent with preserving the property for the purpose to which it is dedicated," *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 967 (9th Cir. 1999), Defendants cannot rely on this exception because of the long history of gun shows at the Orange County Fairgrounds. *See Martinez*, 561 U.S. at 685 ("Once it has opened a limited public forum, . . . the State must respect the lawful boundaries it has itself set.") (internal quotation marks and brackets omitted).

Defendants contend that SB 264 and SB 915 are sufficiently "definite and objective" within the framework of a limited public forum analysis, because those regulations "enact a reasonable restriction on ***illegal*** firearm, firearm precursor part, and ammunition transactions at gun shows for the purpose of mitigating gun violence."[61] As previously stated in the Court's analysis of commercial speech, however, the statutes are overly broad, and they do not reasonably achieve California's interest in restricting ***illegal*** firearm-related crime, because the statutes ban lawful firearm sales that would otherwise be allowed at brick-and-mortar gun stores. The Ninth Circuit also instructs that reasonable speech restrictions must be supported by an independent review of the record, *Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 651 (9th Cir. 2019), and the challenged statutes fail on that point because their legislative histories do not evaluate the risk of illegal firearm sales at the Orange County Fairgrounds or at California-based gun shows, but, instead, they generalize harms from gun shows conducted in other states.[62] As such, SB 264 and SB 915 do not enact reasonable subject-

---

[59]     Amended Complaint ¶ 11.

[60]     Motion 14:5-8.

[61]     Opposition 15:6-8 (emphasis added).

[62]     Plaintiffs' RJN, Ex. 2 at 3; *see also* Barvir Declaration, Ex. 34 at 33.

matter restrictions consistent with the First Amendment protections afforded to limited public forums.

### (b)    Viewpoint Neutral Standard

"In addition to being reasonable, the [state]'s exclusion of speech from a limited public forum must be viewpoint neutral." *Seattle Mideast Awareness Campaign*, 781 F.3d at 501. "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). In their Opposition to the Motion, Defendants claim that SB 264 and SB 915 are viewpoint neutral because "they apply to any event on the Fairgrounds and all state property, not just to gun shows. Cal. Penal Code §§ 27573, 27575."[63]

"Despite the neutral content of a statute on its face, however, a statute as-applied may be constitutionally infirm if its enforcement is based on viewpoint discrimination." *Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1158 (9th Cir. 2007). During the hearing on the Motion, Defendants conceded that only Plaintiffs and similarly situated gun show vendors are affected by the challenged statutes, because no other tradeshows deal in firearms.[64] Although a regulation may be deemed neutral "even if it has an incidental effect on some speakers or messages but not others," *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), "'viewpoint discrimination' occurs when the government prohibits 'speech by particular speakers,' thereby suppressing a particular view about a subject." *Rosenbaum*, 484 F.3d at 1158 (citing *Giebel v. Sylvester*, 244 F.3d 1182, 1188 (9th Cir. 2001)).

Here, the Court finds sufficient evidence that SB 264 and SB 915 have a viewpoint-discriminatory purpose. Legislative history shows that the goal of the two statutes is to end gun shows in California,[65] and, while the opinions and statements of legislators are not dispositive of viewpoint discrimination, *see Dobbs v. Jackson Women's Heath Org.*, 142 S. Ct. 2228, 2255 (2022) ("This Court has long disfavored arguments based on alleged legislative motives."), those statements are circumstantial evidence that the statutes disfavor the lawful commercial speech of firearm vendors. *See Perry*, 460 U.S. at 46 (holding that governments may not "suppress expression merely because public officials oppose the speaker's view"). In view of the above authorities and evidence, as well as the Orange County Fairgrounds' status as a limited public forum, the Court concludes that

---

[63]    Opposition 15:4-6.

[64]    Hearing Transcript 25:15-26:12.

[65]    *See* Amended Complaint ¶¶ 131, 137, 138, 141-144, 149, & 152.

Defendants are engaging in viewpoint discrimination by prohibiting otherwise-lawful gun shows.

### iii.    Expressive Conduct

The Court must evaluate Plaintiffs' allegation that the 32nd DAA has refused to permit gun shows that exclude firearm-related sales.[66]  Plaintiffs assert not only that Defendants have used SB 264 and SB 915 to ban the sale of firearms, but also that California legislators have threatened the 32nd DAA's board members with personal liability if any future gun shows are approved.[67]  The statutes at issue prohibit only the sale of firearms, but Plaintiffs contend that those laws serve as a pretextual means for banning all aspects of "gun culture" practiced and exhibited at gun shows.[68]

Expressive conduct "is constitutionally protected only if it is 'sufficiently imbued with elements of communication[,]'" meaning "'[a]n intent to convey a particularized message [is] present, and . . . the likelihood [is] great that the message w[ill] be understood by those who view [ ] it[.]'" *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058 (9th Cir. 2010) (citing *Spence v. Washington*, 418 U.S. 405, 409-11 (1974)). Defendants fail to address in their Opposition why the 32nd DAA refused to contract with Plaintiffs to use the Orange County Fairgrounds, or whether groups that exclude firearm vendors would be eligible to host gun shows. *See Hartranft v. Encore Cap. Grp., Inc.*, 543 3d 893, 913 (S.D. Cal. 2021) ("where a non-moving party fails to address an argument raised by the moving party in the opposition brief, the Court may consider any arguments unaddressed by the non-moving party as waived").  Accordingly, the Court concludes that Plaintiffs will likely succeed on the merits by showing that the 32nd DAA's actions infringe upon speech and expressive conduct by refusing to permit gun shows that exclude firearm vendors and sales.

### b.    Plaintiffs' Second Amendment Claim

Plaintiffs contend that California's prohibition on firearm sales at the Orange County Fairgrounds infringes their Second Amendment rights and that "the State's ban on selling firearms, ammunition, and firearm parts implicates keeping and bearing arms under the Second Amendment."[69]  Defendants oppose the Motion by arguing that

---

[66]    Motion 10:13-17; Amended Complaint ¶ 166.

[67]    Amended Complaint ¶ 161, 163, & 164.

[68]    Motion 7:3-9.

[69]    *Id.* at 22:23-28.

SB 264 and SB 915 do not meaningfully restrict Plaintiffs' access to firearms, and, therefore, those statutes do not infringe Plaintiffs' Second Amendment rights.[70]

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has repeatedly held that "the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2125 (2022); *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010) ("[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."); *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms.").

In *Bruen*, the Supreme Court instructed lower courts to employ a two-step analysis when considering Second Amendment claims. First, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. When government regulation implicates an individual's Second Amendment rights, "the government may not simply posit that the regulation promotes an important interest," but, instead, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The Court will address each step in turn.

### i.     *Bruen* Step-One Analysis

As a preliminary matter, evolving Supreme Court jurisprudence regarding the Second Amendment has overturned much of the Ninth Circuit's precedent relating to restrictions on gun shows. Whereas the *Nordyke* line of cases may be instructive regarding gun shows and commercial speech, the Ninth Circuit's previous interpretation of the Second Amendment—as guaranteeing only "a *collective* right for the states to maintain an armed militia" and "offer[ing] no protection for the individual's right to bear arms," *Nordyke 2003*, 319 F.3d at 1191 (emphasis in original)—has been unambiguously overturned by *Heller* and its progeny.

After the decisions in *Heller* and *McDonald*, Alameda County was compelled in *Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012) ("*Nordyke 2012*"), to revise its interpretation of the ordinance at issue there; instead of prohibiting the possession of firearms at gun shows, vendors were required to secure firearms "to prevent

---

[70]     Opposition 21:13-24.

unauthorized use" and to attach cables to firearm fixtures to display tables—"much as cell phones, cameras, and other attractive items routinely are displayed for sale." *Id.* at 1044.

The question now before the Court is whether banning the sale of firearms at gun shows at the Orange County Fairgrounds, and state-wide, restricts an individual's rights under the Second Amendment. *Bruen*, 142 S. Ct. at 2126. Because the Second Amendment protects the individual's right to keep and bear arms in self-defense, it also must protect the attendant rights of gun ownership that make keeping and bearing arms meaningful. *See Heller*, 554 U.S. at 629 (striking down a ban on handguns, even though the statute at issue permitted the ownership of other types of firearms); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 697 (9th Cir. 2014) (extending Second Amendment rights to the purchase of ammunition, because "without bullets, the right to bear arms would be meaningless"); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (*en banc*) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms.") (citing *Heller*, 554 U.S. at 617–18); *Boland v. Bonta*, 2023 WL 2588565, at \*4 (C.D. Cal. Mar. 20, 2023) (granting a preliminary injunction against a California law preventing plaintiffs from "purchas[ing] state-of-the-art handguns for self-defense" because the restriction infringed Second Amendment rights); *Renna v. Bonta*, 2023 WL 2846937 (S.D. Cal. April 3, 2023) (also enjoining California laws imposing onerous safety regulations on the sale of new handgun models).

Defendants' main contention in their Opposition is that SB 264 and SB 915 do not infringe Second Amendment rights because those statutes do not meaningfully restrict an individual's ability to acquire firearms.[71] Defendants highlight *Teixeira* as controlling, in which the Ninth Circuit held that "gun buyers have no right to have a gun store in a particular location, at least as long as their access is not meaningfully constrained." *Teixeira*, 873 F.3d at 680.

In *Teixeira*, the Ninth Circuit heard an appeal from plaintiffs who wanted to open a gun store in Alameda County, but who were denied a permit by the county because of zoning restrictions. *Id.* at 673. Plaintiffs filed a Second Amendment action against the county, and the Ninth Circuit held that a plaintiff "cannot state a Second Amendment claim based solely on the ordinance's restriction on his ability to *sell* firearms." *Id.* (emphasis in original). Although the Ninth Circuit declared that "[w]e need not define the precise scope of any such acquisition right under the Second Amendment to resolve

---

[71]     *Id.* at 21:13-24.

this case"; "[w]hatever the scope of that right, Teixeira has failed to state a claim that the ordinance impedes Alameda County residents from acquiring firearms." *Id.* at 678.

Examining the Second Amendment's protections for the acquisition of firearms, the *Teixeira* court held that the plaintiffs did not adequately allege that "residents cannot purchase firearms within the County as a whole, or within the unincorporated areas of the County in particular." *Id.* The Ninth Circuit reached that conclusion because there were several other gun stores within the county at which residents could purchase firearms and ammunition, including one gun store that was "600 feet away from the proposed site of Teixeira's planned store." *Id.* at 679.

*Teixeira* did not provide a precise standard for what regulation of this type would infringe an individual's Second Amendment rights, but the Ninth Circuit did note that:

> The closest Teixeira comes to stating a claim that his potential customers' Second Amendment rights have been, or will be, infringed is his allegation that the ordinance places "a restriction on **convenient access** to a neighborhood gun store and the corollary burden of having to travel to other, more remote locations to exercise their rights to acquire firearms and ammunition in compliance with the state and federal laws."

*Id.* (emphasis added). Although "the Second Amendment does not elevate convenience and preference over all other considerations," *id.* at 680, analyzing an individual's ability to acquire firearms is a starting point for assessing whether a prohibition on gun sales infringes the Second Amendment.

In the instant action, Plaintiffs claim that before the enactment of SB 264 and SB 915, Crossroads "was the largest vendor of gun show events in California and at the Fairgrounds."[72] Those gun shows served as a "modern bazaar" and a "convention-like setting" that, according to Plaintiffs, was an "incalculable benefit to the gun-buying consumer"; gun shows "promote[d] public safety."[73]

Furthermore, Plaintiffs maintain that gun shows are distinct from gun stores because "[g]un shows are designed so that people will congregate, take their time, engage each other and the vendors, and learn in a way that they do not otherwise engage."[74] In addition to selling firearms and ammunition, gun shows "are a cultural marketplace[]" where customers can not only learn about firearms and weapon safety, but also celebrate

---

[72]    Amended Complaint ¶ 11.

[73]    *Id.* at ¶ 61.

[74]    *Id.* at ¶ 65.

"gun culture" and the Second Amendment.[75]  Plaintiffs claim that gun show customers are able to interact with experienced dealers in a way that "that they cannot get anywhere else."  Although Defendants argue that plenty of brick-and-mortar gun stores exist throughout both California and Orange County that sell firearms and ammunition, Defendants fail to identify how the general experience of Plaintiffs' gun shows can be replicated by alternative forums in the area.[76]

At the hearing on the Motion, the parties agreed that there was no alternative gun show in Orange County on private property and that Crossroads' gun shows at the Orange County Fairgrounds were the largest in the county.[77]  Plaintiffs also stated at the hearing that no other suitable venue exists in Orange County for hosting a gun show at the scale of Crossroads' gun shows at the Orange County Fairgrounds.[78]  Therefore, the instant action is distinct because there is no alternative gun show in Orange County, let alone within "600 feet" of the Orange County Fairgrounds.  *Teixeira*, 873 F.3d at 679.  Because SB 264 and SB 915 sufficiently implicate individual rights under the Second Amendment, the Court will proceed to the second step of *Bruen*.

### ii.    *Bruen* Step-Two Analysis

In view of the Court's determination that SB 264 and SB 915 burden conduct protected by the Second Amendment, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Bruen*, 142 S. Ct. at 2127.  To satisfy that burden, the state must show that "historical regulations impose a comparable burden on the right of armed self-defense" and that "that burden is comparably justified" while "engaging in an analogical inquiry."  *Id.* at 2133 (citing *McDonald*, 561 U.S. at 767).

*Bruen* instructs that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check" and that a "well-established and representative historical *analogue*" need not be a "historical *twin*."  *Id.* (emphasis in original).  Furthermore, the Supreme Court directed that the "job of judges is not to resolves historical questions in the abstract," but to "resolve *legal* questions presented in particular cases or controversies."  *Id.* at 2131 n.6 (emphasis in original).  "Courts are thus entitled to decide a case based on the historical record compiled by the parties."  *Id.*

---

[75]    *Id.* at ¶¶ 66, 67, & 70.

[76]    Defendants' Supplemental Brief 4:18-5:2.

[77]    Hearing Transcript 27:21-28:23.

[78]    *Id.* at 36:20-37:10.

Here, Defendants are unable to identify a historical analog to SB 264 or SB 915. Although Defendants chose not to explore the history of gun shows in their papers, the absence of a historical analog is unsurprising given the more modern appearance of gun shows in the United States. Instead, Defendants identify general laws in which governments regulated firearm-related possession and trade, and they reiterate their argument that Plaintiffs did not have a "freestanding right to engage in firearms commerce divorced from the citizenry's ability to obtain and use guns."[79] *Teixeira*, 874 F.3d at 684. The Court will examine these arguments in turn.

> ### (a) Laws Prohibiting Firearms on Public Property and Sensitive Places

First, Defendants assert that "the challenged statutes were enacted under the government's well-established authority to set limits on the use of its property when it is acting as a proprietor."[80] While Defendants are correct that the government possesses rights that are similar to those of a private property owner when the government is acting as proprietor of its land—and Defendants identify out-of-circuit authorities holding the same,[81] *see GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*, 212 F. Supp. 3d 1348, 1363 (N.D. Ga. 2016) (upholding the prohibition of firearms on U.S. Army Corps of Engineers property)—Defendants miss the proverbial forest for the trees. Because SB 264 and SB 915 concern the ***sale*** of firearms and firearm-related goods—and not the possession of those items—that analysis collapses into the First Amendment's limited public forum doctrine and acceptable regulations of commercial speech. *See Martinez*, 561 U.S. at 685. Once the state has opened a public forum to gun shows and other similarly situated vendors, the state may impose only restrictions that are viewpoint neutral and reasonable. *Id.* at 679.

Looking next to historical restrictions on the right to possess firearms, Defendants contend that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful" and outside the "scope of the Second Amendment."[82] *Heller*, 554 U.S. at 626-27 & n.26. Those same restrictions extend to some public spaces and large public gatherings, and Defendants cite several laws from the 1800s that included ballrooms, parks, and universities.[83] Although Defendants concede that "these historical

---

[79]     Defendants' Supplemental Brief 7:4-16.

[80]     Defendants' Supplemental Reply 3:16-18.

[81]     *Id.* at 4:4-17.

[82]     Defendants' Supplemental Brief 11:15-17.

[83]     *Id.* at 11:26-28, 12:2-3, 12:5-7, & 12:26-27.

analogues regulated the carrying, not the sale, of firearms in sensitive places,"[84] Defendants posit that "if anything, that means that such laws were more, not less, restrictive than SB 264 and SB915."[85] In further supplemental briefing, Defendants also highlight historical firearm prohibitions at state legislatures, courthouses, places of worship, and public schools.[86]

Those historical analogues are unhelpful, though, because there is no historical basis for a public space such as the Orange County Fairgrounds to be designated as a sensitive space. To the contrary, Plaintiffs hosted gun shows at the Orange County Fairgrounds for the past 30 years, and the Orange County Fairgrounds advertises itself as a commercial forum for a wide variety of vendors.[87] Furthermore, Defendants attempt to flip *Bruen* on its head by asserting that "there is no historical right under the Second Amendment to sell firearms and related products on state property."[88] While that may be true, government defendants may not shift the burden to plaintiffs under *Bruen* when attempting to identify historical analogs for firearm regulations. *See Bruen*, 142 S. Ct. at 2130. Instead, it is the state that bears the burden of identifying a historical analog to its proposed firearm regulation. Here, Defendants fail to satisfy that burden.

### (b) Government Regulation of Commerce to Promote Public Safety

Next, Defendants declare that "[f]irearms and ammunition . . . have been regulated 'from the dawn of American history'" and that, dating back to colonial times, the states used formal and informal means to regulate the gun trade.[89] In support of their contention that SB 264 and SB 915 are merely a continuation of that tradition, Defendants identify several laws dating back to the 1800s that regulated the sale and storage of gunpowder, the manufacture of firearms and magazines, the fire inspection of arms depots, and the establishment of shooting galleries and gun ranges.[90]

Although those examples may show that states exercised regulatory power over the possession and sale of firearms and ammunition, Defendants cannot properly analogize those regulations to a complete prohibition of the sale of otherwise-lawful firearms at the

---

[84]     *Id.* at 13:13-14.

[85]     *Id.* at 13:14-16.

[86]     Defendants' Second Supplemental Brief 4:23-5:12.

[87]     Motion 14:5-8.

[88]     Defendants' Supplemental Reply 3:22-23.

[89]     Defendants Second Supplemental Brief 7:16-17 & 7:22-8:3.

[90]     *Id.* at 8:13-10:18.

Orange County Fairgrounds or at other gun shows held on state property. Regulations governing the safety of firearms and gunpowder in the 1800s cannot act as a self-serving carveout for states to ban the sale of firearms, or otherwise to infringe Second Amendment rights that are concomitant with First Amendment protections for commercial speech.

Moreover, "[i]n analyzing possible analogues, one of the aspects of the laws the Court must consider is whether the historical 'restrictions imposed a substantial burden on [the Second Amendment right] analogous to the burden created by' the current law." *Boland*, 2023 WL 2588565, at *8 (citing *Bruen*, 142 S. Ct. at 2145)). Throughout their papers, Defendants repeatedly recite that the purposes behind the challenged statutes are to prevent ***illegal*** firearm sales and to stop the crimes associated with those illegal sales.[91] None of the laws that Defendants identify as historical analogs banned the sale of otherwise-legal firearms, nor did those laws regulate any limited public forum analogous to gun shows like those held at the Orange County Fairgrounds.

If anything, the fact that gun shows in California must fully comply with all laws applicable to brick-and-mortar stores makes the above comparators inapposite, because the examples that Defendants cite were equally applied to all firearm vendors and gunowners. No law that Defendants cite permitted the state arbitrarily to ban firearm sales in disfavored forums, nor did those laws discriminate between gun vendors based upon whether the sales took place on public or private land. Statements by the challenged bills' author highlight the difficulty that Defendants face in finding a historical analog; California State Senator Min declared that "California will become the first in the nation to enact a total ban statewide" on gun shows.[92] The right to sell firearms is neither freestanding nor unlimited, *Teixeira*, 873 F.3d at 684, but neither is the state's ability to impose restrictions on firearms that are inconsistent "with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. In sum, the Court concludes that Plaintiffs will likely succeed on the merits of their Second Amendment claim.

### c.    Plaintiffs' Equal Protection Claim

Plaintiffs assert that because Defendants have violated their First Amendment rights through the challenged statutes, they also violate Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.[93] U.S. Const. amend. XIV. "[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to

---

[91]    Opposition 16:9-11.

[92]    Amended Complaint ¶ 149.

[93]    Motion 20:9-21:4.

those wishing to express less favored or more controversial views." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Id.*

As Defendants admit in their Opposition, Plaintiffs' Equal Protection claim "rise[s] and fall[s] with the First Amendment claims." *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012). Similar to the court in *OSU Student Alliance*, because the Court concludes that Plaintiffs are likely to prevail on their First Amendment claims that Defendants are "engaging in viewpoint discrimination," it concludes that Plaintiffs are also likely to prevail on their Equal Protection claim "for differential treatment that trenched upon a fundamental right." *Id.* (citing *A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784, 798 (9th Cir. 2006)). As such, it is unnecessary for the Court to reach the question of whether Plaintiffs can prevail under a "class-of-one" theory under their Equal Protection claim. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

## 2. Remaining Preliminary Injunction Factors

Having examined Plaintiffs' likelihood of success on the merits of the constitutional claims, the Court will next analyze the remaining preliminary injunction factors under *Winter*, 555 U.S. at 20.

### a. Irreparable Harm

When a court evaluates a motion for a preliminary injunction, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because Plaintiffs are likely to prevail on their First, Second, and Fourteenth Amendment claims, this element of the preliminary injunction test is satisfied.

### b. Balance of the Equities and Public Interest

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "These factors merge when the Government is the opposing party." *Id.* The Ninth Circuit directs that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) (internal citation and quotation omitted). Additionally, "courts have 'consistently recognized the significant

public interest in upholding First Amendment principles.'" *Id.* (citing *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012)).

Defendants assert that the balance of the equities and the public interest weigh against granting a preliminary injunction because, given the rationale for the statutes, "[t]he costs of being mistaken[] on the issue of whether the injunction would have a detrimental effect on []gun crime, violence . . . would be grave."[94] *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015), *aff'd*, 637 F. App'x 401 (9th Cir. 2016). Defendants cite examples from the legislative history of the challenged statutes in support of their contention,[95] but, as detailed above, none of the studies that Defendants cite evaluates the harms and risks associated with gun shows at the Orange County Fairgrounds or in California in general. To the contrary, the studies that the legislative history cites list California as an exception to legal loopholes associated with gun shows elsewhere in the United States.[96] Accordingly, those preliminary injunction factors weigh in favor of Plaintiffs.

## C.     Bond

Defendants did not request, in their briefing or during the hearing, that Plaintiffs post a bond or other security. *See* Fed. R. Civ. P. 65(d). Indeed, "[c]ourts routinely impose either no bond or a minimal bond in public interest environmental cases." *City of South Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1148 (C.D. Cal. 1999) (citing *People* ex rel. *Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.), *modified on other grounds*, 775 F.2d 998 (9th Cir. 1985)); *see also Renna*, 2023 WL 2588565, at *15 (same, with respect to public interest cases). Accordingly, this requirement is waived and no bond will be required.

## D.     Defendants' Request for Stay of Preliminary Injunction Pending Appeal

At the hearing on the Motion, Defendants made for the first time a request that the Court stay any preliminary injunction until Defendants could file an appeal.[97] "A stay is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Index Newspapers*, 977 F.3d at 824 (citing *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). "The party requesting a stay bears the burden of showing that the

---

[94]     Opposition 25:5-9.

[95]     *See* Plaintiffs' RJN, Ex. 2 at 3; *id.*, Ex. 10 at 2-3; *id.*, Ex. 17 at 2 & 4.

[96]     Barvir Declaration, Ex. 33 at 33.

[97]     Hearing Transcript 72:15-16.

circumstances justify an exercise of that discretion." *Id.* (citing *Nken*, 556 U.S. at 433–34).

A court deciding whether to grant a stay of an injunction pending appeal must weigh the following: (1) whether the movants have made a strong showing that they are likely to succeed on the merits; (2) whether the movants will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *See id.* (citing *Nken*, 556 U.S. at 426). Additionally, "[t]he bar for obtaining a stay of a preliminary injunction is higher than the *Winter* standard for obtaining injunctive relief." *Id.* at 824 (citing *Winter*, 555 U.S. at 20). The Ninth Circuit directs that "the first two *Nken* factors are the most critical, and that the second two factors are only considered if the first two factors are satisfied." *Id.* Defendants "must show a *strong* likelihood of success on the merits." *Id.* (emphasis in original). "And 'simply showing some possibility of irreparable injury fails to satisfy the second factor.'" *Id.* (citing *Nken*, 556 U.S. at 434-35). Furthermore, "the demanding standard applicable here requires that the [defendants] show 'that irreparable injury is likely to occur during the period before the appeal is decided.'" *Id.* (citing *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020)).

Here, Defendants' oral motion to stay fails because Defendants satisfy none of the requirements established by the Ninth Circuit in *Index Newspapers*. As discussed above, Plaintiffs—not Defendants—have shown a likelihood of success on the merits of Plaintiffs' constitutional claims. Defendants also have not demonstrated irreparable injury. Although crimes committed with illegal firearms are unquestionably a serious concern, Defendants have not shown that there is an appreciably higher risk of illegal gun sales occurring at gun shows than there is at brick-and-mortar stores in California. Furthermore, given that Plaintiffs aver that the 32nd DAA will negotiate event dates only for the following calendar year,[98] it is unlikely that any gun sales will take place at the Orange County Fairgrounds before Defendants have appealed the preliminary injunction. Accordingly, Defendants' oral request to stay this Court's Order pending appeal is **DENIED**.

## V. DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1. Plaintiffs' instant Motion for a preliminary injunction is **GRANTED**.

---

[98] Amended Complaint ¶ 90.

2. Defendants, their employees, agents, successors in office, and all District Attorneys, County Counsel, and City Attorneys holding office in the State of California, as well as their successors in office, are preliminarily **ENJOINED** and **RESTRAINED** from engaging in, committing, or performing, directly or indirectly, by any means whatsoever, any enforcement of California Penal Code sections 27573 or 27575.

3. Upon request by Plaintiffs, Defendant 32nd DAA must make available the next available date for a gun show and must allow Plaintiff Crossroads to reserve dates for gun show events (and to hold such events) at the Orange County Fairgrounds as the 32nd DAA would any other event promoter who has previously held events at the Orange County Fairgrounds.

4. Defendants' request to stay this Order pending appeal is **DENIED**.

**IT IS SO ORDERED.**

Dated: October 30, 2023

John W. Holcomb
UNITED STATES DISTRICT JUDGE